In re MALDEN MILLS INDUSTRIES,
INC., et al., Debtors.

Nos. 01–47214–JBR to 01–47217–JBR.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 19, 2003.

John T. Morrier, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, for Debtors.

Melvin S. Hoffman, Looney & Grossman, LLP, Boston, MA, for Ernst B. Weglein.

*MEMORANDUM OF DECISION ON OBJECTION TO THE PROOF OF CLAIM FILED BY ERNST B. WEGLEIN*

JOEL B. ROSENTHAL, Bankruptcy Judge.

Before the Court is the Objection of Debtors to Proof of Claim filed by Ernst

B. Weglein [# 1250], and the Response of Ernst B. Weglein [# 1338]. The Court held an evidentiary hearing, and now sustains in part and overrules in part the Objection of Debtors to Proof of Claim filed by Ernst B. Weglein.

## I. FACTS [1]

1. On November 29, 2001, Malden Mills Industries, Inc. and certain affiliates ("Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2. On September 1, 1989, Weglein was employed by Malden Mills ("Malden Mills" or "Malden"), its subsidiary and/or parent corporations, as General Counsel.

3. The terms of Weglein's employment as General Counsel are set forth in a letter agreement between Weglein and Malden Mills dated October 5, 1994 ("Employment Agreement").

4. Malden Mills terminated Weglein's employment by letter dated November 29, 2001.

5. As of the termination date, the then-current term of the Employment Agreement was to have expired on September 1, 2004, leaving thirty-three months or 2.75 years remaining under the Employment Agreement.

6. Weglein's annual base salary on the date of his termination was $175,100. In addition, Weglein received a car allowance of $10,200 annually, dental insurance ($857.16), health insurance ($7,206.84) and life insurance ($9,494).

7. Malden Mills did not invoke the termination for "just cause" provision con-

---

**1.** All relevant facts in this case are undisputed, and are set forth in Section G of the Joint Pre-hearing Memorandum of Debtors and Ernst B. Weglein [# 1821]. The Court has included additional facts relevant to the terms of the Employment Agreement.

tained in Weglein's Employment Agreement.

8. Clause 6.C, Termination Without Cause, of the Employment Contract provides:

If you are terminated without cause ... then Malden ... shall pay to you, until the end of your then current Term, the Salary as severance pay ("Severance Pay") and, in addition, for the balance of your natural life, provide to you and your eligible dependents, the dental and health insurance and the life insurance benefits set forth in Paragraph 4(e) hereof (at the cost provided for therein).

9. On May 30, 2002, Weglein filed a Proof of Claim in this case for $743,767.72.

10. On February 7, 2003, Debtors filed its Fourth Omnibus Objection to the Proofs of Claim which included an objection to Weglein's Proof of Claim on the grounds that Weglein's claim was subject to the cap provided in Bankruptcy Code § 502(b)(7) and should be allowed in the reduced amount of $189,896.20 as a general unsecured claim.

11. On March 7, 2003, Weglein filed his response to Debtor's objection, acknowledging that a portion of his claim was subject to the § 502(b)(7) cap but asserting that his claim should be allowed in the amount of $380,358.23.

12. Weglein's total claim as adjusted in his response to Debtor's objection, $670,871, is composed of the following: (i) damages for termination in the amount of $529,809; (ii) unpaid vacation wages of $15,930; and (iii) contingent retirement contributions of up to $125,132.[2]

13. In Debtors' Report and Hearing Agenda [# 1377], Debtors recommended the allowance of Weglein's claim in the amount of $199,411.74, consisting of a Class 10 Non–Priority Wage Claim totaling $14,111.74 and a general unsecured claim totaling $185,300.

14. As of the evidentiary hearing, Malden Mills has made no contributions to the Malden Mills' non-union retirement plan for FY 2001–2002 or thereafter.

15. Weglein has outstanding debt owed to Malden Mills as of the Petition Date in the amount of $73,500 pursuant to a $100,000 secured Term Note and mortgage, secured by Weglein's Massachusetts residence.

16. Weglein does not assert any claim against Debtor for bonus payments under his Employment Agreement.

17. On the date of his termination, Weglein had accumulated 231 hours of unused vacation time. Weglein has received from Malden Mills $4,650 in payment of that portion of his vacation wage claim entitled to priority under Bankruptcy Code § 507(a)(3).

## II. ANALYSIS

### Calculation of Claim

Weglein asserts a claim which exceeds $545,000 against Malden Mills. This claim encompasses damages arising from the termination of Weglein's Employment Agreement with Malden Mills, as well as unpaid pre-petition vacation time and contingent retirement plan contributions. Bankruptcy Code Section 502(b)(7) caps the maximum claim that can be allowed by the Court to an employee for *damages*

---

**2.** Although Malden has not made contributions to the Malden Mills' non-union retirement plan for FY 2001–2002 and has made no contributions up to the time of the evidentiary hearing, as discussed *infra,* Weglein asserts a contingent claim for retirement contributions that would arise if Malden either made retroactive contributions or began making current contributions.

resulting from a terminated employment contract. *In re Interact Medical Technologies Corporation,* No. 98–42912, slip op. at 11 (Bankr.D.Mass.2003). Weglein concedes that those damages arising from the termination of the Employment Contract are capped by § 502(b)(7). Weglein further argues, however, that a portion of his claim, including amounts owed for unpaid-pre-petition vacation wages and contingent retirement contributions, do not arise from the Employment Agreement termination, and should thus be allowed in full.

*1) Damages Arising from Termination of the Employment Contract*

Weglein's claim for employment termination damages of $529,809 stems from Weglein's salary and employment benefits, as identified in paragraph 6.C of the Employment Agreement. The contractual damages for termination provided for under the Employment Agreement are composed of the total salary through the end of the Employment Agreement's then-current term, plus dental, health and life insurance for the rest of Weglein's natural life. For purposes of computing his damages claim, Weglein includes the value of dental, health and life insurance only through the end of his then current employment term. Therefore the contractual damages for termination stemming from the Employment Agreement are Weglein's salary ($175,100), plus dental insurance ($857.16), health insurance ($7,206.84), and life insurance ($9,494), multiplied by 2.75 years for a total damages claim of $529,809.

▮ Once the correct termination damages are determined, the next step in a § 502(b)(7) analysis is to determine the capped amount. Section 502(b)(7) "limits

damages for breach of 'employment contracts' to a maximum of one year's compensation." *Interact Tech.,* p. 12 (citing *In re Continental Airlines Corp.,* 64 B.R. 865, 873 (Bankr.S.D.Tex.1986)). The Court must therefore determine Weglein's total annual compensation under the Employment Contract. In addition to salary, dental, health and life insurance, Weglein argues that his compensation includes his annual car allowance ($10,200), long-term disability insurance premium ($2,520.08), professional dues and fees ($5,110), and "Malden's legally required payments on behalf of its employees" ($13,856.78). This Court finds that Weglein's car allowance, long-term disability insurance, professional dues and fees, health, dental and life insurance are indeed part of Weglein's compensation under the Employment Contract, while the "legally required payments" are not.

As this Court noted in *Interact Technologies,* many courts include only salary in a determination of what is compensation. Slip op. at 13 (citations omitted). In *Interact Technologies,* however, this Court declined to take so limited a view of compensation, and held that "[g]iven the expanding and creative methods of compensating employees, this Court believes that compensation may include things other than salary, so long as those things can be readily determined under the contract at issue." *Id.* at 14. The Court's understanding of compensation is reinforced here by the Employment Contract. Section 4 is specifically entitled "Compensation" and includes the following: salary; bonus; car allowance; business travel expenses; fringe benefits; and vacation.[3] Under the Employment Contract, fringe benefits include, among other items:

---

**3.** Weglein does not ask that bonus money, business travel expenses, or vacation be included in his total compensation for the year.

group disability and term life insurance; dental and health insurance; all applicable licensing, certification and registration fees, all professional association dues and membership fees related to Weglein's performance under the Employment Agreement, and all reasonable costs associated with Weglein's attendance at not fewer than two continuing legal education seminars per annum.[4]

■ On the other hand, Malden's "legally required payments on behalf of its employees" should not be included in Weglein's total compensation amount. Weglein asserts that these "legally required payments" consist of taxes paid for Federal Unemployment, State Unemployment, Workers' Compensation, Old Age, Survivors and Disability Insurance ("OASDI"), and Medicare. Weglein offers absolutely no legal authority for such a conclusion. These payments do not arise from the Employment Agreement, but rather arise under state and federal law as an obligation Malden Mills has on behalf of every employee. In addition, Malden correctly argues that including these amounts in the allowed claim amount would essentially re-quire Debtors to pay a portion of the "legally required payments" twice, as Debtors will make any required contributions on Weglein's behalf for distributions Debtors issue on account of those portions of the severance payments subject to these taxes. (Reorganized Debtors' Post-hearing Memorandum, p. 6).

Weglein's total compensation for one year following the date of the filing of the petition is $210,488.08,[5] while his total damage claim is $529,809.

## A. Setoff

■ The parties agree that Weglein holds a right of setoff against Malden of $73,500 on account of a secured term note, but disagree as to how this setoff right should be applied to Weglein's total claim against Debtors. The parties disagree as to whether the setoff amount should be applied before or after the application of the § 502(b)(7) cap. In the absence of caselaw on point, both parties refer to cases discussing setoff in terms of the statutory cap created by § 502(b)(6), which caps damages accruing to a lessor for damages resulting from termination of a lease.[6]

---

4. Weglein has included in his computation of professional dues, fees, and CLE the actual fees of the various bar associations in which Weglein was a member and the estimated cost of attending two seminars per year.

5. The year's worth of compensation is calculated from November 29, 2001, the date of Debtors' petition. Malden and Weglein disagree as to whether Weglein's termination was effective as of November 29, 2001, or shortly thereafter. The § 502(b)(7) cap is effective from the earlier of (i) the date of the filing of the petition, or (ii) the date on which the employer directed the employee to terminate employment under an employment contract. Therefore, for purposes of the current analysis, the exact date of termination is irrelevant, as November 29, 2001, the date of the petition, is also the earliest effective date of termination proposed by the parties.

6. Section 502(6) provides:
(b) Except as provided in subsection (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—

. . . .

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claims exceeds—
(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
(i) the date of the filing of the petition, and
(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property, plus

Although a majority of courts apply security deposits to the capped amounts provided in § 502(b)(6), those circumstances are distinguishable from a claim under § 502(b)(7). As the Court noted in *Young v. Condor Systems, Inc. (In re Condor Systems, Inc.)*, " § 502(b)(6) provides an unreliable analogy for § 502(b)(7)," in part because "[s]ecurity deposits are peculiar, term-of-art creatures of contract that have a rich history in the specialized field of landlord-tenant law that differentiates them from other lease-related remedies and from employment termination damages." 296 B.R. 5, 18 (9th Cir. BAP 2003).

Thus, where employment termination damages are concerned, the Court must look to the plain language of § 502(b)(7) to determine the correct application of the setoff amount. This section directs the Court first to determine the amount of a termination damages claim *as of the petition date*, and second, to allow such claim to the extent it does not exceed the capped amount provided by § 502(b)(7). The § 502(b)(7) cap simply creates a mechanical test to measure the allowable portion of terminated employee claims from a specific measuring date. *Condor Systems*, 296 B.R. at 12.

Following the procedure of § 502(b)(7), the Court must first determine the allowable claim for termination damages as of the petition date. As discussed, *supra*, the total damages claim is $529,809. As of the petition date, a creditor's claim also includes the right of setoff pursuant to § 553.[7] A creditor maintains the right to offset a mutual debt owed by the creditor to the debtor that arose before commencement of the case. § 553. Weglein may therefore setoff his debt to Malden of $73,500 against the $ 529,809 owed by Malden to Weglein. Only then should the § 502(b)(7) cap be applied. Indeed, for this Court to hold any differently would be to ignore the goal of setoff that a creditor not be required to pay his debt in full to a debtor while requiring the debtor to pay only a percentage of the debt owed to the creditor. *See In re Anchorage International Inn, Inc.* 16 B.R. 308, 313 (Bankr.D.Alaska 1981) (citing 4 Collier on Bankruptcy, P. 68.02 at pp. 852–54 (14th ed.1978)). Therefore, as of the Petition Date, Weglein's net damages claim was $456,309, his total damages minus the setoff amount. This claim is allowed in the total amount of the § 502(b)(7) cap, $210,488.08.

### 2) Unpaid Vacation Wages [8]

The next component of Weglein's claim is unpaid vacation wages in the amount of $15,930. A portion of Weglein's vacation wages were unpaid as of the petition date, and so are payable pursuant to § 502(b)(7)(B), which provides that any unpaid compensation due under the Employment Contract shall be added to the § 502(b)(7)(A) capped amount. Malden asserts the unpaid vacation time should be paid in the reduced amount of $14,795.58. This relatively small difference is attributable to a disagreement as to whether

---

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates....

7. Section 553(a) provides:

Except as otherwise provided in this section and in section 362 and 363 of this title, this title does no affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...

8. Debtor and Weglein agree on the number of hours of unpaid vacation time, and that the claim should be treated as a Class 10 claim under the Debtor's plan of reorganization.

Weglein's yearly car allowance should be included as salary for purposes of determining the hourly wage paid on account of each vacation hour.

Weglein bases his claim on the fact that he received his car allowance as part of his monthly paycheck, whether he used this amount towards car expenses or not. Section 502(b)(7), however, requires only that unpaid compensation due under the Employment Contract as of the petition date be allowed. Weglein only asserts that vacation time, and not the car allowance, was unpaid as of the Petition Date. Further, Weglein did not present any evidence that Malden included the car allowance in his monthly paycheck as anything other than a means of distributing the benefit, rather than as a form of salary. Therefore, because the car allowance was paid in full as of the petition date, it should not be included in the unpaid compensation amount due to Weglein. As Malden correctly asserts, to include the car allowance in the unpaid compensation amount due under 502(b)(7)(2) would be to require Debtor to pay the same compensation twice. Therefore, the total amount of Weglein's allowed unpaid vacation wage claim is $14,795.58.

### 3) Contingent Claim for Uncapped Retirement Contributions by Debtor

■ The final component of Weglein's claim is $125,132 in contingent retirement contributions. Weglein asserts his claim arises because, had he not been terminated, he would have remained with the Debtor until his planned retirement in February, 2005. Thus, he argues, he maintains a contingent claim for retirement funds paid between fiscal year 2001, when Debtor ceased payment of retirement contributions, to February, 2005 when he testified he would have retired.

It is unclear on what legal basis Weglein's assertion rests. Weglein simply testified that Malden may have a legal right to make retroactive retirement contributions on behalf of employees. (Hearing Transcript lines 13–20). No evidence was presented to indicate that Malden was ever under any obligation to make these payments pre-petition. Similarly, Weglein does not explain why he would be entitled to payments from the retirement plan after his termination. Weglein was not guaranteed a right to receive retirement contributions in his employment contract. Weglein's claim for contingent retirement benefits is disallowed due to the absence of any legal basis on which this claim may rest.

## III. CONCLUSION

For the foregoing reasons, the Objection of Debtors to Proof of Claim filed by Ernst B. Weglein is SUSTAINED in part and OVERRULED in part, and the claim of Ernst B. Weglein is ALLOWED in the amount of $225,283.66, comprised of $210,488.08 in capped termination damages and $14,795.58 in unpaid vacation wages.

A separate order will issue.

### ORDER ON OBJECTION TO THE PROOF OF CLAIM FILED BY ERNST B. WEGLEIN

For the reasons set forth in the Memorandum of Decision issued contemporaneously herewith, the Objection of Debtors to Proof of Claim filed by Ernst B. Weglein is SUSTAINED in part and OVERRULED in part, and the claim of Ernst B. Weglein is ALLOWED in the amount of $225,283.66, comprised of $210,488.08 in capped termination damages and $14,795.58 in unpaid vacation wages.