**In re PROTARGA, INC., f/k/a Neuromedica, Inc., Reorganized Debtor.**

**Protarga, Inc., f/k/a Neuromedica, Inc., Plaintiff,**

**v.**

**Nigel L. Webb and Five Palms Corporation, Ltd., Defendants.**

**Bankruptcy No. 03–12564(PJW).**

**Adversary No. 04–53374(PJW).**

United States Bankruptcy Court, D. Delaware.

Sept. 1, 2005.

Raymond H. Lemisch, Adelman, Lavine, Gold and Levin, A Professional Corporation, Wilmington, DE, William R. Hinchman, Jennifer R. Hoover, Adelman, Lavine, Gold and Levin, A Professional Corporation, Philadelphia, PA, for Plaintiff.

Warren T. Pratt, Drinker, Biddle & Reath, LLP, Wilmington, DE, Alice W. Ballard, Law Office of Alice W. Ballard, Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This is the Court's ruling following a six-day trial on Protarga, Inc. f/k/a Neuromedica, Inc.'s ("Protarga") complaint objecting to Nigel L. Webb's ("Webb") proof of claim and asserting counterclaims.[1] Webb's proof of claim is based on an employment contract. For the reasons set forth below, the Court finds in part for Protarga and in part for Webb.

## BACKGROUND

From its inception in 1991, Protarga was a start-up drug development company. The company hired Webb in 1993. Protarga and Webb entered into three successive employment agreements, one in 1993, one in 1997 and the last one in 2001. The 2001 employment agreement (the "Employment Agreement"), was for a five-year term starting on June 1, 2001 and ending on May 31, 2006. The Employment Agreement has a number of alternative severance payment packages, each being dependent on the circumstances of Webb's employment termination. Also, in 1993 Protarga and Webb executed an intellectual property agreement (the "IP Agreement") pursuant to which all of Webb's "inventions" during his employment would become the property of Protarga. The IP Agreement has rather conventional terms typical of such agreements that are widely used by companies engaged in developing new products or systems.

From 1993 until July 2003, Webb served as president and chief executive officer of Protarga. In August 2000, Webb was elected chairman of Protarga's board of directors (the "Board"), and served in that position until July 31, 2003. He continued to serve as a Board member until August 21, 2003.

Protarga had developed a few promising anti-cancer drugs that were in phase 2 clinical trials during 2001. From its founding in 1991 through 2002 Protarga financed its development operations with a combination of debt and equity funds totaling approximately $57 million. (Doc. # 480, p. 15.)[2] In 2001 Protarga embarked on an initial public offering of its stock (the "IPO"). It filed its registration statement with the Securities and Exchange Commission in December 2001. It continued moving forward on this track until it became clear in 2002 that the market conditions would prevent a successful IPO. Protarga was forced to withdraw its registration statement in October 2002. From that point on its financial condition deteriorated dramatically.

During the spring of 2003 Protarga began negotiating an agreement with Spectrum Pharmaceuticals, Inc. ("Spectrum") pursuant to which Spectrum would be the stalking horse bidder for all of Protarga's assets after Protarga filed for bankruptcy relief. Protarga's management was sharply divided on this course of action, with Webb opposing it.

In an effort to address its liquidity crisis, in June 2003, Protarga offered its employees a temporary salary reduction so that it could continue operating. Webb

---

1. The docket numbers for the transcripts from the hearing are as follows: doc. # 107 is 6/20/05; doc. # 108 is 6/21/05; doc. # 101 is 6/22/05; doc. # 102 is 6/23/05; doc. # 103 is 6/24/05; and doc. # 111 is 7/11/05. In the interest of brevity, the Court will cite to the 6/20 hearing as Tr. 1; the 6/21 hearing as Tr. 2; the 6/22 hearing as Tr. 3; the 6/23 hearing as Tr. 4; the 6/24 hearing as Tr. 5; and the 7/11 hearing as Tr. 6.

2. References to the docket items in the chapter case will be cited as "Doc. # __" and references to the docket items in this adversary proceeding will be cited as "AP Doc. # __."

accepted this offer and was granted additional stock options to purchase 72,000 shares of the company's stock with an exercise price of $0.01. In July 2003, Protarga was still having serious financial problems and it offered its employees a furlough proposal pursuant to which the employees would forego their salary but continue working. Webb rejected this offer on July 24, 2003 and asserts that as of that date his employment was terminated without cause.

After July 24, 2003, Protarga asserts that it discovered disturbing evidence relating to Webb's work on a personal project of his that improperly diverted Protarga personnel and resources. That project was the construction and furbishing of a luxurious home in the Bahamas. The home is owned by defendant Five Palms Corporation, Ltd. ("Five Palms"). Five Palms is a corporation owned and controlled by Webb and members of his family. On August 22 and 26, 2003 the Board passed resolutions terminating Webb for cause.

On August 14, 2003, Protarga filed a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").[3]

Following the bankruptcy filing, in September 2003, Protarga's business was exposed to an auction sale process. The stalking horse, Spectrum, was not the highest bidder. The business was sold to Luitpold Pharmaceuticals, Inc. ("Luitpold"), a subsidiary of a large Japanese pharmaceutical company, in a sale that closed on October 20, 2003. Luitpold purchased Protarga's business for $7.5 million plus a structure that provides additional future payments to Protarga in the event

milestones are achieved related to drug development programs that Luitpold acquired from Protarga. (Doc. # 480, p. 15.) This sale transaction produced a "change of control" as contemplated by the Employment Agreement, which event significantly enhanced the amount that Webb could receive as a severance package.

On November 29, 2004 Protarga's disclosure statement (the "Disclosure Statement") was approved. On January 14, 2005 Protarga's plan of reorganization (the "Plan") was confirmed. The Plan calls for a combination of cash distributions and participation arrangements for claimants.

The instant matter involves a disputed proof of claim that has been amended a number of times by Webb. On October 29, 2003, Webb filed his initial proof of claim in the amount of $2,642,609.75. (Claim # 28.) Subsequently, on December 10, 2004, Webb amended his proof of claim and increased the amount sought to $2,803,996.12. (Claim # 179.) Immediately prior to the trial on this matter, Webb filed his latest amendment to the proof of claim on June 1, 2005 in which he increased the amount sought to $2,931,191.07. (Claim # 245.) Webb's claim of $2,931,191.07 consists of the following: (1) the Employment Agreement severance package of $2,058,299.98, (2) a 25% "liquidated damages" claim under the Pennsylvania Wage Payment and Collection Law (the "WPCL"), 43 Pa. Stat. Ann. §§ 260.1 *et seq.* (West 2005), in the amount of $514,574.97 and (3) attorneys' fees and costs (as allowed for a successful claimant under the WPCL) of $358,316.22.[4] Even as to this latest proof of claim, Webb asserts that there are amounts that have yet to be determined and that there will be

---

3. Individual sections of the Bankruptcy Code will be cited herein as " § ___".

4. For convenience purposes, Webb's aggregate claim of $2,931,191.07 will be referred to as a "$2.9 million" claim.

additional attorneys' fees sought.[5] (Claim # 245, p. 4.)

In December 2004 Webb filed a complaint in the Court of Common Pleas for Philadelphia County against Robert Dickey, IV ("Dickey"), an officer and director of Protarga, and John E. Koerner, III ("Koerner"), a director of Protarga, in which he alleges that, pursuant to the WPCL, these two defendants are obligated to pay him for the same claim as he asserts here. Webb's state law complaint also asserts a count for defamation. The state court action has not yet gone to trial.

Aside from bankruptcy law considerations, the amount of Webb's entitlement turns on whether he was terminated for cause or without cause. Webb asserts that he was terminated without cause in connection with a change of control (the sale to Luitpold) and is entitled to a severance package spelled out in the Employment Agreement as follows:

(a) The Employee shall be paid within five (5) days after termination a severance benefit equal to 300% of the sum of (i) his then current Base Salary; and (ii) his then-applicable Bonus Opportunity;

(b) The Company shall pay to the Employee in a lump sum within five (5) days after termination, the compensation and benefits otherwise payable to him under Section 3 through the last day of his employment, including without limitation an amount equal to the amount of his then current Bonus Opportunity times a fraction the numerator of which is the number of days through the first day of the fiscal year in which termination occurs through the date of

termination and the denominator of which is 365;

(c) The Company shall provide the Employee with continued health, dental, life, short and long term disability insurance, out placement benefits and then-current prerequisites for the period specified under Section 4980B(f) of the Code (sometimes referred to as "CO-BRA") (or cash in lieu of continuation of such benefits for the COBRA period, to the extent that such continuation is not permissible).

(Protarga Ex. # 16, § 7.2.) According to Webb, the base salary and the bonus opportunity alone, when multiplied by three, produces a payment obligation of $1,693,302.98. (Claim # 245, p. 3.)

Protarga disputes Webb's entitlement under this provision of the Employment Agreement because it asserts Webb was terminated for cause. Under this scenario, the Employment Agreement provides for a much smaller severance package as follows:

In the event of Termination for Cause pursuant to Section 5.1 or termination at the election of the Employee pursuant to Section 5.4, the Company shall pay to the Employee the compensation and benefits otherwise payable to him under Section 3 through the last day of his employment, including without limitation an amount equal to the amount of any Bonus for the year in which termination occurs times a fraction the numerator of which is the number of days from the first day of the fiscal year in which termination occurs through the date of termination and the denominator of

5. From at least as early as July 2003 Webb was receiving the advice and assistance of legal counsel in his dealings with Protarga on his employment matters (Tr. 6, pp. 136, ln. 9—138, ln. 9); as of December 10, 2004 (six months before the trial of this adversary pro-

ceeding), he had incurred legal fees of $170,498.81 (Claim # 179); and as of June 1, 2005 (prior to the trial of this adversary proceeding), Webb had incurred legal fees of $358,316.22. (Claim # 245.)

which is 365. Except as required by law, all compensatory pay and benefits to the Employee shall cease as of the date of termination.

(Protarga Ex. # 16, § 6.1.)

In addition, Protarga asserts two set-off amounts. One is based on Webb's alleged diversion of Protarga resources. Specifically, Protarga claims that for a period of well over one year prior to July 24, 2003, Webb utilized a massive amount of Protarga's personnel and other resources to work on Webb's Five Palms project in the Bahamas. Also, Protarga seeks a set-off for amounts it asserts are owing to it pursuant to a promissory note executed by Webb. Both of these matters are discussed in detail below.

While Protarga's complaint sets forth numerous theories for recovery against Webb and in opposition to Webb's proof of claim, the essential issues are whether Webb's employment was terminated for cause; to what extent Webb is obligated to reimburse Protarga for his use of Protarga's resources and personnel arising out of Webb's work on the home in the Bahamas; and to what extent there exists an unpaid balance on Webb's promissory note.

The parties agree that Webb has a disputed general unsecured claim. When the Plan became effective the automatic stay terminated and Webb's disputed claim thereafter became subject to the claims resolution process spelled out in the Plan. Section 12.1(b) of the Plan specifies that this Court shall retain jurisdiction to hear all matters arising out of and related to the Chapter 11 case and the Plan, including "[t]o hear and determine any and all adversary proceedings, applications and contested matters." (Doc. # 465, § 12.1.) Section 7.2 of the Plan provides that "[n]otwithstanding any other provision of the Plan, no Cash shall be distributed under the Plan on account of any Disputed Claim until such Claim is deemed Allowed." (*Id.*, § 7.2.) Pursuant to section 1.4 of the Plan, an allowed claim means "any Claim which, if Disputed, has been Allowed by Final Order." (*Id.*, § 1.4.) A final order is an order entered by a court as to which neither party can seek an appeal, a re-hearing, or a re-argument. (Id., § 1.37.) Webb filed no objection to the Plan as it relates to the disputed claims resolution process. Pursuant to the Bankruptcy Code, Webb's employment termination claim was discharged on the effective date of the Plan and the Plan, being in effect a contract between Protarga and its creditors, including Webb, determines what Webb is entitled to by way of a distribution.

When Protarga sold its business to Luitpold, it received a substantial cash payment and entered into a rather complex arrangement (the "Participation Agreement") whereby in addition to the up-front cash payment by Luitpold, Protarga, as the reorganized debtor, will be entitled to participate, in specified dollar amounts and time frames, in Luitpold revenues derived from any successful marketing of certain drugs that Protarga was developing. That participation may produce income for the reorganized debtor which in turn will be paid out to Plan claimants and interest holders. This complex long-term arrangement is set forth in detail in the Disclosure Statement. (Doc. # 480.)

As a general unsecured claim, Webb's claim is in Class 4A of the Plan. In several places in the Disclosure Statement there is a discussion of the treatment of class 4A claims. For example, page 10 of the Disclosure Statement contains the following statement with respect to choices of treatment for allowed general unsecured claims:

Each creditor holding an Allowed General Unsecured Claim will therefore

have three choices with respect to converting such Allowed Claims into equity: (i) if no other option is selected, receive approximately 31% of their Allowed Claim in Upfront Cash and approximately 69% as an interest in the Unsecured Creditors Note; (ii) convert all of their Allowed Claim into equity; or (iii) convert only the "note portion" of their Allowed Claim into equity.

(Doc. # 480, p. 10.)

The Plan vote tabulation (Doc. # 516) shows that Webb voted to reject the Plan and did not make any election with respect to the available choices. Thus, Webb will be entitled to receive approximately 31% of his allowed claim in Upfront Cash and approximately 69% as an interest in the Unsecured Creditors Note. The Disclosure Statement also contains the following statement regarding the potential distributions to creditors holding an interest in the Unsecured Creditors Note:

> Once the Upfront Cash is distributed, the only future distributions to creditors will result from payments from Luitpold to Protarga under the Participation Agreement. As discussed in Section IV. C.2. Monte Carlo Simulation, there is considerable uncertainty as to the amount, if any, that will ever be received under that agreement. However, the likelihood that Luitpold will make future payments to Protarga is the same whether the claimant holds an interest in the collateralized Unsecured Creditors' Note or holds new preferred stock.

(Doc. # 480, pp. 27–28.) Thus, it is unknown whether and when the holders of an interest in the Unsecured Creditors Note will receive any distributions with respect to that note. The vote tabulation (Doc. # 516) shows that at least 29 other Class 4A creditors did not opt to receive an

equity interest in the reorganized debtor and, therefore, to the extent their claims are allowed, they will also be holders of an interest in the Unsecured Creditors Note.

## DISCUSSION

*Termination For or Without Cause*

■ In order to properly address the issue of Webb's termination, it is important to understand in greater detail the situation at Protarga leading up to its filing for bankruptcy relief.

Once it became clear the IPO was not going forward in late 2002, cash flow became a serious problem and Protarga sought help for its chief financial officer, Dickey, in dealing with the situation. Webb and Dickey engaged in a search for such help and in January 2003 retained the services of NachmanHaysBrownstein, Inc. ("NHB"), a management consulting firm. (Tr. 2, pp. 107, ln. 19—110, ln. 18.) NHB examined Protarga's affairs and rendered a report to the Board on January 17, 2003 in which it suggested, among other things, that Webb step aside as president and/or take a reduction in compensation. (Tr. 1, pp. 21, ln. 20—22, ln. 3; Tr. 2, pp. 116, ln. 16—117, ln. 8.) The Board determined the report went beyond the scope of NHB's retention and, by resolution dated January 21, 2003, terminated the relationship with NHB and disavowed the report. (Protarga Ex. # 21; Tr. 1, p. 21, ln. 17–23.)

As a result of the NHB report, the management personnel situation at Protarga took a dramatic turn for the worse. Webb viewed NHB's report as a conspiracy by Dickey and Koerner to oust him.[6] Webb and Walter Goehring ("Goehring"), an investor and Board member, contacted Edward R. Gates ("Gates"), a director of Protarga, and advised Gates that Dickey and Koerner conspired to have the consul-

---

6. Koerner had invested in excess of $15 million in Protarga. (Tr. 4, p. 34, ln. 1–2.)

tant give a report very negative as to Webb. (Tr. 1, p. 18, ln. 11–19.) Gates agreed with Webb that if in fact Dickey did what was alleged he should be fired. (Tr. 1, p. 18, ln. 20–21.) However, on January 31, 2003, Gates and certain other outside directors conducted an investigation into the matter and concluded that Dickey and Koerner did not conspire to remove Webb. (Tr. 1, p. 20, ln. 4–8.) The investigation resulted in a realignment of responsibilities and reporting functions which significantly reduced the number of people reporting directly to Webb. However, the entire affair resulted in a very strained relationship between Webb on the one hand and Dickey and Koerner on the other. (Tr. 1, p. 20, ln. 12–16.)

The degree of animosity that developed from the dispute is clearly reflected in notes that Gates made and notes that Dickey made at the time of the January 31, 2003 investigation. (Protarga Ex. ## 24 & 25.) According to Gates' notes, a number of management employees reported to him that Webb's conduct was "very difficult," "erratic, autocratic," and "aggravating." (Protarga Ex. # 24; Tr. 1, p. 27, ln. 10.) Webb's principal antagonist was Dickey who viewed Webb's conduct as "distant," "surreal," "scary" and "increasingly disengaged." (Protarga Ex. # 25.) Dickey concluded that "frankly we don't need [Webb]." (*Id.*)

As noted above, simultaneous with pursuing cost cutting efforts, Protarga began negotiations for the sale of its assets to Spectrum. On July 17, 2003, Spectrum offered to purchase certain of Protarga's assets through a sale pursuant to § 363, which offer was contingent on Protarga filing for chapter 11 on or before July 23, 2003.

On July 17, 2003, the Board also held a meeting during which it discussed the issue of retaining employees after July 18, 2003, and whether the directors could be personally liable if Protarga had no funds available to pay the employees. The Board passed a resolution which contained an offer to Protarga employees to accept an agreement pursuant to which they would forego their salary pending further developments with respect to a possible sale to Spectrum (the "Furlough Agreement"). (Protarga Ex. # 44.) The Furlough Agreement was to apply to all employees relevant to this matter and specified that in the event an employee rejected the agreement, the employee "shall be terminated". On July 24, 2003, Webb sent a letter to the Board notifying it that he declined to sign on to the Furlough Agreement and that he thereby was terminated without cause. (Protarga Ex. # 58.) Some background to this event is as follows.

The members of the Board uniformly stated that they were under the impression that Webb orchestrated the Furlough Agreement. The particulars of that testimony are as follows:

(1) Gates: "Dr. Webb proposed this concept of—that was called a furlough." (Tr. 1, p. 45, ln. 22–23.)

(2) Goehring: "It [the Furlough Agreement] was Nigel's idea." (Tr. 3, p. 5, ln. 17.)

(3) Thomas Perun ("Perun"), a director of Protarga: "The first person who mentioned the word 'furlough' was Nigel [Webb]." (Tr. 3, p. 17, ln. 12–13.)

(4) Roger Feldman ("Feldman"), the acting secretary at Protarga during the relevant time period: "I believe it [the proponent of the Furlough Agreement] was Nigel Webb." (Tr. 3, p. 34, ln. 4–5.)

(5) Richard Power ("Power"), a director of Protarga: "My belief [is that] it was Nigel [Webb]" who came up with the Furlough Agreement. (Tr. 3, p. 102, ln. 8.)

(6) Dickey: "my recollection is that Mr. Webb actually came up with the idea for the furlough, in consultation—or as a result of some discussions with Ed Mazurek from Morgan, Lewis, labor counsel to the company" (Tr. 2, p. 157, ln. 4–7); "This plan [the Furlough Agreement] had been pushed by Webb." (Tr. 2, p. 166, ln. 16.)

(7) Koerner: "I'm not sure if Dr. Webb didn't first suggest it [the Furlough Agreement]" and proceeded to explain why he believed Webb was orchestrating it. (Tr. 4, p. 39, ln. 17—p.40, ln. 13.)

Webb denies that he was the architect of the Furlough Agreement. (Tr. 6, p. 127, ln. 1–12.)

There was also considerable evidence presented over the confusion that existed at the time regarding the intent and effect of the Furlough Agreement. The July 17, 2003 Board minutes recite the Furlough Agreement as follows: "All employees other than Mesdames DePaul, Patelmo and O'Hare shall be offered an unpaid leave of absence and if such employees fail to accept such offer, they shall be terminated." (Protarga Ex. # 44.) A serious question exists as to whether the Board intended that the termination be automatic. One definition of the word "shall" is a demand that requires action by someone. *See* Merriam–Webster's Collegiate Dictionary 1075 (10th ed.1993) ("used to express a command or exhortation"). As such, one interpretation of the resolution is that the Board was required to take action subsequent to a rejection in order to terminate an employee. If a termination was to be automatic, the resolution could easily have been drafted to say something to the effect of "failure to accept the offer will constitute a termination of employment", or, it could have said "employees who fail to accept the offer are thereby terminated."

There was also an exchange of e-mails that confirm the significant degree to which the resolution was subject to confusion and misunderstanding. In Webb's July 18, 2003 e-mail to Feldman, he stated that "[i]n the event that an employee declines to accept option (1) or (2) then the board has instructed that they are immediately terminated without cause, except for DePaul" etc. (Webb Ex. # 151.) This is not a correct statement. The resolution does not say they "are" terminated, it says "shall be terminated" and it does not say "without cause." In a July 22, 2003 e-mail from Goehring to Webb, Goehring inquired as follows: "my fellow directors, i have the following questions and comments as we approach (final) decisions for protarga.... 1. would either nigel or rob please e-mail the directors and inform us how the furlough plan worked out. who accepted and *who resigned?*" (Webb Ex. # 160 (emphasis added).) In response, Webb e-mailed back as follows: "We will let you know who accepts the company's offer of furlough, or is terminated, after we receive the individual decisions. *Resignation* would be entirely up to the individual." (*Id.* (emphasis added).) This exchange suggests that a failure to accept the Furlough Agreement amounts to a voluntary "resignation" by the employee. In his July 24, 2003 fax to Gates where he indicated that he would not sign the Furlough Agreement, Webb stated: "Accordingly, I understand that the company has terminated my employment agreement ... effective today automatically." (Webb Ex. # 170.) Of course, his employment agreement was not terminated and this communication may be viewed as Webb's "resignation". This was followed up by Gates' July 30, 2003 fax to Webb where Gates stated: "As we discussed earlier today, your understanding that your employment agreement with the Company has been terminated is not correct. The Company

has not terminated your employment or your employment agreement." (Webb Ex. # 179.) And Gates pointed out that a human resources person who sent Webb a termination package "was operating under an erroneous assumption arising from your communication regarding your employment status and should not have furnished you with the letter since your employment has not been terminated." (*Id.*) Gates went on to say that "[w]e accept that there has been a misunderstanding . . . . Please let me know your plans for returning to work." (*Id.*) Webb did not return to work.

The members of the Board also uniformly stated that they were surprised that Webb declined to sign the Furlough Agreement and that he took the position that he had been terminated. The particulars of that testimony are as follows:

(1) Gates: he did not believe that if Webb did not sign the furlough agreement that he would be terminated. (Tr. 1, p. 114, ln. 4–10.)

(2) Goehring: "surprised and shocked" when he heard that Webb declined to sign the furlough. (Tr. 3, p. 6, ln. 5–6.)

(3) Perun: "totally taken aback" by Webb's position. (Tr. 3, p. 17, ln. 25.)

(4) Feldman: "felt personally duped" when Webb rejected the furlough offer. (Tr. 3, p. 34, ln. 24.)

(5) Power: "to me it was unbelievable that he rejected it when it was his idea, and, you know, that he was in a very precarious situation." (Tr. 3, p. 102, ln. 15–17.)

(6) Dickey: he did not believe that rejection of the offer would trigger severance; it was unclear what had happened and whether Webb "terminated himself" (Tr. 2, p. 168, ln. 20–23); the Board felt they had been "duped" (Tr. 2, p. 166, ln. 12–16); thought everyone was on board with respect to the furlough. (Tr. 2, pp. 159, ln. 21—160, ln. 5.)

(7) Koerner: "amazed" when he heard of Webb's rejection, "it came out of the blue." (Tr. 4, p. 41, ln. 15.)

Given this uniformity of views regarding Webb's role in orchestrating the Furlough Agreement, I find that he did not deal with the Board in good faith on this matter. My conclusion on this issue is that Webb outmaneuvered a Board whose collective attention (other than Webb's) was focused on the company's financial crisis and measures designed to salvage whatever value remained in the enterprise. Webb testified that in his dealings with Protarga matters he wore three hats, one as a director, one as an officer and one as an individual employee. (Doc. # 441, pp. 32–34) Presumably, he was wearing his employee hat during his conduct relating to the Furlough Agreement.

Ironically, that maneuvering by Webb may have been unnecessary. In the Spring and Summer of 2003 it was clear that Webb's time with Protarga was limited as the company moved closer to bankruptcy. The deal being negotiated with Spectrum entailed Protarga filing a chapter 11 case and then being sold to Spectrum as a going concern. As negotiations progressed with Spectrum and the prospects for a chapter 11 filing grew, it became clear that if Spectrum acquired the business it had no interest in hiring Webb. Thus, under a Spectrum purchase scenario, Webb's employment surely would be terminated. When Luitpold became the successful bidder for the assets in September 2003, Luitpold apparently likewise had no interest in hiring Webb. Thus, absent the events brought on by the July furlough fiasco, Webb's employment would likely have been terminated without cause immediately following the closing on the sale to Luitpold.

Most of the trial was devoted to Webb's activities with respect to the Five Palms project and the extent to which Webb's use of company resources and personnel and his own time constituted a breach of his Employment Agreement commitment to "devote his full business time" to his duties as the CEO of Protarga. (Protarga Ex. # 16, § 2(b).) There is a sharp dispute regarding the extent to which Protarga's resources were utilized by Webb for his Five Palms project. Protarga put on two former employees who testified about the amount of time that they each spent working on the Five Palms project. Edward Keiper, the information technology director at Protarga, testified that he spent 65% of his time working on Five Palms matters during 2002. (Tr. 2, p. 8, ln. 18–23.) Bernadette McCollum, an administrative assistant who worked for Webb, testified that during 2002 she spent 95% of her time working on Five Palms matters. (Tr. 4, p. 7, ln. 9–12.) While Webb tried his best to discredit this testimony, I find the testimony of both witnesses to be credible as both of them were disinterested witnesses. Webb's testimony on his use of company personnel and other resources, very little according to him, is not believable.

In connection with this testimony, there was considerable effort spent deciphering the fax activity between Protarga's offices in King of Prussia, Pennsylvania and persons involved with Webb in the building of the home in the Bahamas. Protarga put on evidence that there were 1200 "fax events" related to the Five Palms project that were sent or received at Protarga offices. (AP Doc. # 112, p. 21.) In Webb's analysis of this data he concludes that "[t]he actual number of Five Palms

documents faxed was only about 200 over a 19–month period from January 2002 to July 2003." (AP Doc. # 116, p. 23.) Even though Webb's number is dramatically smaller than Protarga's, I find that this is still a large amount of fax activity devoted to Webb's personal interests. Weighing all the evidence regarding Webb's use of the company personnel and resources on his Five Palms project, I conclude that he abused what may be characterized as an executive officer's perquisite.

While Webb's conduct relating to the furlough fiasco and the work on his Five Palms project clearly suggests improprieties justifying termination for cause, the matter is not that simple because the Employment Agreement narrowly defines termination for cause. Section 5.1 of the Employment Agreement defines "cause" as follows:

> For the purposes of this Agreement, "Cause" for termination shall *only* be deemed to exist upon (a) the occurrence of dishonesty; (b) the occurrence of gross negligence or misconduct of the Employee which is materially injurious to the Company; (c) the conviction of the Employee of, or the entry of a pleading of guilty or nolo contendere by the Employee to, any crime involving moral turpitude or any felony, or (d) the refusal by the Employee to implement an approved resolution of the Board, insofar as such resolution is reasonable and not inconsistent with the terms of this Agreement and Company policy.

(Protarga Ex. # 16, § 5.1 (emphasis added).[7]) It is clear that subparts (c) and (d) do not apply here. With respect to subpart (a), the occurrence of dishonesty, the facts are conflicting. Despite Protarga's evidence of Webb's extensive use of Pro-

7. Significantly, the word "only" was not contained in the two earlier employment agreements and was only added to the 2001 Employment Agreement. (*See* Protarga Ex.#8, § 5.1 & 9, § 5.1.)

targa resources for the Five Palms project, Webb presented significant evidence demonstrating that for a long time other Protarga employees, including Gates and Dickey, knew about his Five Palms activities and never objected or questioned him about it. (Webb Ex. # 28; Tr. 4, pp. 91, ln. 3—95, ln. 10.) Furthermore, Webb had an arrangement with Protarga that allowed him to periodically reimburse Protarga for his personal expenses related to that project. (Webb Ex.## 83, 86, 87 & 122; Tr. 4, pp. 94, ln. 20—97, ln. 21.) Webb also offered substantial evidence to rebut Protarga's assertion of a massive number of faxes relating to Five Palms going in and out of Protarga's offices. Protarga's evidence may be a basis to conclude that Webb abused an executive officer's perquisite, but I do not believe that amounts to dishonesty in the sense in which that word is used in the Employment Agreement.

With respect to subpart (b), "gross negligence or misconduct ... materially injurious to the Company," I do not believe that Protarga has demonstrated that Webb's Five Palms activities were materially injurious to Protarga. Webb put on evidence regarding his substantial efforts in 2002 to effect the IPO and during 2002 and 2003 to obtain equity funding for Protarga, an assignment given to him by the Board. (Webb Ex. ## 114, 115 & 230; Tr. 4, pp. 149, ln. 1—165, ln. 15.) It cannot be seriously argued on the record here that Protarga's financial collapse was attributable to Webb's work on the Five Palms project.

In summary, while I find that there existed a good faith dispute regarding Webb's employment termination rights, I do not believe Protarga has proven termination for "cause" as that term is defined in the Employment Agreement.

Moreover, I do not find that the August 22 and August 26, 2003 Board resolutions change this result. The resolutions state that Webb "refused to perform any of his duties and responsibilities ... and abandoned his position at a critically important time for the Company." (Protarga Ex. ## 75 & 76.) However, if Webb's interpretation of the Furlough Agreement is correct, he had already been terminated prior to these resolutions and that would explain why he did not show up for work. Indeed, even Gates acknowledged in his July 30, 2003 fax to Webb that there had been a "misunderstanding" as to the intent of the Furlough Agreement. (Protarga Ex. # 68.) Additionally, the resolutions recite that Webb's employment was "terminated for Cause within the meaning of his employment agreement." (Protarga Ex.## 75 & 76.) As discussed above, I do not find this to be the case. This vague reference to the Employment Agreement suggests to me that the Board was not then in a position to articulate sufficient facts to make out a case for termination for cause. To the extent those two August resolutions were intended to encompass Webb's conduct in working on the Five Palms project, I do not believe the evidence supports a finding in that regard within the contemplation of termination for cause set forth in Section 5.1 of the Employment Agreement. For all of these reasons, I find that Webb was terminated without cause. Because the October 2003 sale to Luitpold resulted in a change of control, Webb's claim is enhanced by section 7.2 of the Employment Agreement. However, Webb's claim must be reduced as required by § 502(b)(7).

§ 502(b)(7) Cap

In pertinent part, § 502(b)(7) provides:

[I]f such objection to a claim is made, the court ... shall determine the amount of such claim as of the date of

the filing of the petition, and shall allow such claim ... except to the extent that—

(7) if such claim is the claim of an employee *for damages resulting from termination of an employment contract,* such claim exceeds—

 (A) the *compensation* provided by such contract, without acceleration, for one year following the earlier of—

 (i) the date of the filing of the petition; or

 (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

 (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(7) (emphasis added).

■ The application of § 502(b)(7) to Webb's claim means that his claim is limited to his one year salary plus fringe benefits that he would have been entitled to after July 24, 2003 and the unpaid compensation for the period up to his termination. Webb's position fails to make the distinction contained in § 502(b)(7) between "damages resulting from the termination" and the "compensation" provided for the one year period. To the extent the former exceeds the latter, the latter controls. This concept is a forward looking one that focuses on what the employee would have earned if he continued his position for the next 365 days. This concept eliminates any consideration of (a) the severance package (including any "bonus opportunity") and (b) the WPCL "liquidated damages." The relevant reported decisions squarely support this conclusion.

■ "This code section was designed to limit the claims of key executives who had been able to negotiate contracts with very beneficial terms." *In re Cincinnati Cord-*

*age & Paper, Co.,* 271 B.R. 264, 269 (Bankr.S.D.Ohio 2001) (citations omitted). The employment contract at issue in *Cincinnati Cordage* provided that each executive was entitled to receive an amount equal to three times his annual base salary if he was terminated for a reason other than death, terminating disability, or serious cause. In its analysis of § 502(b)(7), the court stated that "[a] claim for severance pay is a claim for damages resulting from the termination of an employment contract." *Cincinnati Cordage,* 271 B.R. at 269 (citations omitted). On this basis, the court held that the one-year cap in § 502(b)(7) applied to limit the severance benefits. *Id.*

In *In re CPT Corp.,* 1991 WL 255679 (Bankr.D.Minn.1991), the court faced the same issue with an employment contract that provided the executive with a severance allowance equal to 24 months base salary from the date of notice or termination. In its discussion, the court noted that "[the executive] was only entitled to the severance payment if he was terminated without cause." *Id.* at *2. For this reason, the court held that "[the executive's] claim against the estate is a claim for damages resulting from the termination of an employment contract as contemplated by section 502(b)(7)." *Id.*

Likewise, the employment contract at issue in *In re Dornier Aviation (North America), Inc.,* 305 B.R. 650 (E.D.Va. 2004), provided that if the executives were terminated without cause they were entitled to two years severance pay. The court stated that the one-year cap in § 502(b)(7) "clearly limits an employee's claim for severance pay, as this is in effect a claim for prospective compensation that is accelerated as a result of the termination." *Id.* at 654.

The court in *In re Uly–Pak, Inc.,* 128 B.R. 763 (Bankr.S.D.Ill.1991) also held that

§ 502(b)(7)'s one-year cap limits severance benefits resulting from the termination of an employment contract. The court noted that a "claim for severance pay is 'for damages resulting from the termination of an employment contract.' Therefore, under § 502(b)(7), the claim is limited to [the executive's] annual salary under the employment contract." *Id.* at 769 (internal citation omitted).

Webb cites two cases that he claims support his position that § 502(b)(7) does not apply here. Neither case supports his position. In *In re Gee & Missler Services, Inc.*, 62 B.R. 841 (Bankr.E.D.Mich.1986) the debtor corporation withdrew from a multi-employer pension fund that was created by a collective bargaining agreement. The issue before the court was whether the withdrawal liability claim was limited by the cap in § 502(b)(7). The court held that § 502(b)(7) did not apply because a collective bargaining agreement is not an employment contract and the claim was not filed by employees. *Id.* at 844–45. Termination of executive employment contracts were not at issue in *Gee and Missler*.

*In re Murray Industries, Inc.*, 147 B.R. 597 (M.D.Fla.1992) likewise does not provide support for Webb. In fact, the court in *Murray Industries* applied the one-year cap in § 502(b)(7) to limit the amount of an executive's compensation. The real issue before the court was whether attorneys' fees were included in the computation of damages when applying the § 502(b)(7) limitation. The court held that attorneys' fees would be limited by the cap and stated, "This Court finds that in light of the lack of case law on this issue, the Bankruptcy Court made a sound decision that Appellant's Claim for damages, which includes both employment compensation and attorney's fees, is subject to the § 502(b)(7) limitation." *Id.* at 600 (citations omitted).

■ I now turn to the determination of the capped amount of Webb's claim. Webb and Protarga agree that his salary for the 365–day period following his termination would have been $376,289.55. (Claim # 245, p. 3; AP Doc. # 113, p. 17 n. 15.) The parties also agree that he would have been entitled to receive $31,876.20 in fringe benefits during the 365–day period. (AP Doc. # 113, p. 17 n. 15; AP Doc. 117, p. 18.) They also agree that Webb is entitled to recover $692.81 for expense reimbursement and $7,236.35 for unused vacation days. (AP Doc. # 113, p. 20 & n. 19; AP Doc. # 117, p. 18; AP Doc. # 118, p. 12.) Finally, they agree that Webb is entitled to recover $322.48 for a CPI related increase from June 1, 2003 to June 15, 2003. (Claim # 245, p. 8; AP Doc. # 113, p. 20 n. 19.) Adding all of these figures provides an agreed amount that limits Webb's employment termination recovery to $416,417.39.

Webb argues that in addition to his base salary his compensation for the ensuing year would have included a bonus. According to the Employment Agreement, Webb was "entitled to receive, no later than March 31 of the immediately succeeding fiscal year, a cash bonus ('Bonus') of up to fifty percent (50%) (the 'Bonus Opportunity') of the Base Salary in effect at the end of such fiscal year . . . . The Bonus for each fiscal year during the Employment Period shall be determined by the Company's Compensation Committee of the Board based on that Committee's assessment of the extent to which the Company has attained its business objectives for the period, which objectives shall be communicated to the Employee prior to the commencement of each fiscal year." (Protarga Ex. # 16, § 3.2.) Webb argues that he is

entitled to a bonus opportunity of $105,670.35. (AP Doc. # 117, p. 17.)

It is clear that Webb was not entitled to receive a bonus in March 2003 with respect to the 2002 fiscal year, nor could he expect to receive a bonus in March 2004 with respect to the 2003 fiscal year. The Board adopted a resolution in December 2002 declaring that there would be no bonuses with respect to fiscal year 2002. Specifically, the December 18, 2002 resolution provides as follows:

> The Board unanimously ratified that Protarga will not pay any bonuses to anyone for 2002 until such time as the Company has raised an additional $20 million (beyond the amount raised in the bridge financing) from (i) the Series F Private Placement or (ii) as cash received from corporate partnering or licensing activities.

(Webb Ex. # 65, p. 1.) Webb confirmed that Protarga did not raise the $20 million. (Tr. 5, p. 62, ln. 21.) With respect to fiscal year 2003, Protarga's bankruptcy status certainly supports the conclusion that no bonuses were going to be paid in March 2004. And no such bonuses were paid in March 2004. On this record, it is appropriate to conclude that for the one year period going forward from July 24, 2003 Webb's compensation would be limited to his base salary, fringe benefits and unpaid pre-termination compensation as detailed above.

*IP Agreement*

In an attempt to avoid the § 502(b)(7) cap, Webb argues that the IP Agreement calls for a payment not subject to § 502(b)(7). As noted above, the IP Agreement is typical of the kind of intellectual property commitments that employees sign in favor of employers engaged in developing new products or systems. During his employment, Webb made sig-nificant intellectual property contributions to Protarga that resulted in a number of patents for its drug development programs. (AP Doc. # 116, p. 2.) According to Webb, the IP Agreement is a separate and distinct contract from the Employment Agreement that contemplates a non-wage payment to Webb as consideration for his intellectual property contribution to Protarga. Therefore, according to Webb, that payment is not subject to the § 502(b)(7) cap. Webb states his position as follows:

> Although the 2001 Employment Agreement (Debtor's Exhibit 16) and the 1993 IP Agreement (Webb Exhibit 272) are related, they are also distinct. Thus, Dr. Webb's damages for breach of the IP Agreement, although calculated with reference to his damages under the 2001 Employment Agreement, are not to compensate him for prospective, post-termination lost earnings. Rather they are consideration for his intellectual property that he conveyed pre-petition to the Company under the IP Agreement. For this reason, Dr. Webb's IP Agreement damages should not be subject to the one-year cap of 11 U.S.C. Section 502(b)(7).

(AP Doc. # 117, pp. 16–17.) This argument is without merit for a number of reasons, including the following.

■ (1) While the IP Agreement is a separate document from the Employment Agreement, the two documents are integrated and must be examined as one. The IP Agreement recites that Webb's obligations under that agreement are "[i]n consideration of [his] engagement, continued engagement and any future engagement as an employee of" Protarga. (Webb Ex. # 272, p. 1.) The 1993, 1997 and 2001 employment agreements provide the terms of that "engagement, continued engagement . . . and future engagement as an

employee." Moreover, section 9 of the Employment Agreement specifically integrates the IP Agreement as follows:

> *Confidentiality and Proprietary Information.* The Employee agrees to continue to be bound by the terms of the Company's Employee Confidentiality and Proprietary Information Agreement, which he entered into on June 4, 1993, except that paragraphs (e) and (f) of such agreement are hereby amended to read in full as set forth in Section 8 hereof.

(Protarga Ex. # 16, § 9.) Thus, not only does that provision integrate the two documents, it actually amends two provisions of the IP Agreement by way of section 8 of the Employment Agreement. In addition, section 14 of the Employment Agreement contains the following integration clause: "This Agreement constitutes the entire Agreement between the parties and supercedes all prior agreements and understandings, whether written or oral, relating to the subject matter of this Agreement, except as set forth in Sections 9 and 10." (Protarga Ex. # 16, § 14.) The IP Agreement contains no integration clause and, indeed, provides that "[t]his agreement is intended to supplement all present and future agreements relating to [Webb's] present and future employment by or consulting agreements with the Company."[8] (Webb Ex. # 272, p. 3.) Therefore, it is clear that the IP Agreement is part of the Employment Agreement and does not provide Webb with an independent right of compensation.

■ (2) Webb's argument that the damage claim is consideration "for his in-tellectual property that he conveyed prepetition to the Company under the IP Agreement" (AP Doc. # 117, p. 17) flies in the face of the plain terms of the IP Agreement. Paragraph (b) of that agreement sets forth Webb's obligations with respect to his intellectual property contributions to Protarga and recites that such "inventions, discoveries and improvements ... shall belong to the Company ...." (Webb Ex. # 272, p. 1.) The IP Agreement is totally silent as to any compensation payable to Webb for intellectual property. Indeed, to the contrary, the IP Agreement recites that "[w]ithout further consideration, [Webb] will assign to the Company or its nominee all of [his] rights and interest in any such inventions, discoveries and improvements...." (Webb Ex. # 272, p. 1.) Thus, as read together, the Employment Agreement dictates the compensation Webb was entitled to for any "inventions" he produced for his employer. Clearly, Webb has no separate damage claim based upon his intellectual property contribution. Since 1993 and up through July 24, 2003 he had been compensated solely pursuant to the terms of the three employment agreements. Also, as discussed above, the Employment Agreement dictates his entitlement to the severance package following his employment termination. Indeed, Webb acknowledges that his damages are calculated solely by reference to the Employment Agreement. (Claim # 245.) Webb has a damage claim arising out of his employment contract but that claim is capped to the extent of his one year of compensation.

---

8. The two prior employment agreements contain a similar incorporation of the IP Agreement into the employment agreements. The 1993 employment agreement states: "The Employee agrees to be bound by the terms of the Company's Employee Confidentiality and Proprietary Information Agreement, attached as Schedule C to this Agreement." (Protarga Ex. # 8, § 8.) The 1997 employment agreement provides: "The Employee agrees to continue to be bound by the terms of the Employee Confidentiality and Proprietary Information Agreement, which he entered into on June 4, 1993." (Protarga Ex. # 9, § 8.)

(3) If it was the intent of the parties to look to the IP Agreement as a separate basis to award Webb for his intellectual property contributions, then one would expect that the Employment Agreement (the only document that addresses any payment to Webb) would call for the same severance payment to Webb without regard to the reason for his termination, or for some fixed amount of any such payments to be allocated to the intellectual property contributions. This is not the case. The Employment Agreement sets forth four distinct payment packages for Webb upon termination of his employment with no allocation for any particular intellectual property contribution by Webb:

(a) In the event of termination for cause or at the election of the employee Webb would be entitled to his regular compensation up to the last date of employment plus an amount equal to the amount of any bonus, pro rated for the year to the date of his termination.

(b) In the event of a termination without cause Webb would be entitled to 300% of his current base salary payable over 12 equal consecutive monthly installments plus fringe benefits for a 12 month period.

(c) In the event of termination for death or disability Webb would be entitled to his regular compensation through the date of termination plus his estate would be entitled to receive in 12 equal monthly installments, an amount equal to his base salary.

(d) In connection with termination without cause and related to a change of control, Webb would be entitled to a payment of a severance benefit equal to 300% of the sum of his base salary and the then applicable bonus opportunity and be entitled to fringe benefits for an 18 month period.

If the severance benefit is payable in consideration of Webb's intellectual property contributions, would not the sever-ance payments be the same without regard for the reason for the termination? Or would not the various severance payments allocate a portion of their amounts to one specific amount for Webb's intellectual contributions? To ask these questions is to answer them. Webb's construct of the IP Agreement is contrived and fundamentally flawed.

(4) Finally, Webb's argument here is in fundamental conflict with his WPCL "wage" claim.

*Pennsylvania Wage and Collection Law*

The second element of Webb's claim is pursuant to the WPCL. Specifically, Webb asserts a right to recover liquidated damages equal to 25% of his severance payment package. (Claim # 245, p. 12.) The relevant statutory provision reads:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe [sic] of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable ... and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe [sic] shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 Pa. Stat. Ann. § 260.10. Webb's WPCL claim is based upon the exact same facts that support his claim under the Employment Agreement. The only reason Webb invokes the WPCL is to benefit from the 25% "liquidated damages" and the attor-

neys' fees provisions of that statute.[9] However, Webb's WPCL claim fails for a number of reasons as detailed below.

### 1. *No Triggering Event*

■ Contrary to Webb's assertions, the severance package did not become due and payable until after the August 14, 2003 bankruptcy petition date and any entitlement to a 25% liquidated damages must await an event that has not yet occurred. In his post-trial response, Webb asserts that he "was terminated without cause on July 24, 2003. Under his Employment Agreement, his severance pay and benefits were due and payable five days thereafter." (AP Doc. # 117, p. 19.) Similarly, in his proof of claim, Webb asserts that he is entitled to the 25% liquidated damages because the wages remained unpaid for 30 days beyond the regularly scheduled pay day (July 31, 2003) and for 60 days beyond an act making wages payable (the termination on July 24, 2003). (Claim # 245, p. 12.) Both of these statements are incorrect.

In the event of a termination without cause related to a change of control event, section 7.2(a) provides that the payment "shall be paid within five (5) days after termination . . . ." (Protarga Ex. # 16, § 7.2.) The WPCL provides that the 25% assessment is made if the wages remain unpaid "in the case where no regularly scheduled pay day is applicable, for 60 days beyond the filing by the employee of a proper claim or for 60 days beyond the date of the agreement, award of other act making wages payable." As discussed below, Webb did not file a proof of claim (a "proper claim") until October 28, 2003. Under the "agreement" timing, namely 5 days, the company had 60 days after July

29, 2003 to make payment before the WPCL triggered any rights. The August 14, 2003 bankruptcy petition occurred long before the expiration of either of these two 60 day periods and "when a corporation under Chapter 11 fails to make payments that the Bankruptcy Code does not permit, the contingency needed to trigger the liability of corporate managers under the Pennsylvania WPCL never occurs." *Belcufine v. Aloe*, 112 F.3d 633, 639 (3d Cir. 1997).

With respect to the date on which Webb made a "proper claim" for purposes of the WPCL, the record is as follows: Webb did not even assert any kind of termination claim until August 12, 2003. In his August 12, 2003 memo to Gates, Webb stated, "I would like to take this opportunity to reassert my claim against Protarga, Inc. for the separation and other payments and benefits due and payable under my employment agreement dated June 1, 2001 as modified, pursuant to my termination without cause on July 24, 2003." (Webb Ex. # 184.) Note that Webb did not assert any amount. The reason for this is obvious. As of August 12, 2003 no one knew whether or when the Spectrum transaction (or a similar sale transaction) would occur and Webb did not know whether he would be asserting a severance claim based on a simple termination without cause or a termination without cause coupled with a change of control event. It was not until late October 2003 when Webb became aware of the closing of the sale transaction with Luitpold that he could assert a "proper claim" as contemplated by the WPCL. That change of control resulted in Webb filing his proof of claim on October 28, 2003. This proof of claim was asserted

---

**9.** With regard to attorneys' fees, the statute provides that "[t]he court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant." 43 Pa. Stat. Ann. § 260.9a(f).

long after the bankruptcy petition was filed that barred Protarga and its affiliates from making any payment other than pursuant to the Bankruptcy Code or as provided in the confirmed Plan. The subject adversary proceeding is determining Webb's entitlement to his claim as called for by the Plan and, therefore, no wage claim is yet due and payable.

## 2. Good Faith Dispute

■ Another reason precluding the application of the WPCL is that there existed a good faith dispute that has not yet been resolved by a final order. Although there is little case law interpreting the WPCL, one case analyzing "good faith dispute" under the liquidated damages provision is instructive. The court in *Hartman v. Baker*, 766 A.2d 347 (Pa.Super.Ct.2000) found that there was a good faith dispute where the employer was unclear as to whether there was a contract between the parties. Even though the employer was ultimately liable for the wages, the court found that because of the good faith dispute the employer was not liable for the liquidated damages. *Id.* at 355.

There are a number of reasons to hold that there has been a good faith dispute with respect to Webb's entitlement to the severance package. Chief amongst these is the six-day trial that was held to determine the basis for and the amount of the claim. On the record before me, I easily conclude that Protarga had a good faith dispute with Webb as to whether he was terminated for cause or without cause, both as to Webb's abuse in the use of Protarga's resources on his Five Palms project and his promotion of and then re-

jection of the Furlough Agreement. Similar to the *Hartman* case, Protarga did not have to "win" on these two issues, but I find that it did have a good faith basis for disputing Webb's claim.

## 3. Set-offs

■ The third basis precluding application of the WPCL is that the statute excuses the employer's performance if there is a "good faith assertion of a right of set-off . . . ." 43 Pa. Stat. Ann. § 260.10. In this case, Protarga has a good faith basis of asserting a set-off against Webb pursuant to (1) Webb's use of Protarga employees for his personal benefit and (2) a promissory note executed by Webb at the time he executed the Employment Agreement.

The first set-off issue concerns the amount that Webb owes to Protarga for his use of employees on Five Palms matters. Protarga calculates that Webb's personal use of its resources has a value of $127,870 and asserts this amount should be set-off against Webb's severance claim.[10] (AP Doc. # 113, p. 13.) Protarga arrived at this number by multiplying the percentage of time certain employees testified they spent on Five Palms matters by their annual salary. (*Id.*, pp. 12–13.) Webb concedes that for the use of those resources he may owe Protarga $20,000 at most. (AP Doc. # 117, p. 9) Under the circumstances, I do not believe it is appropriate to charge Webb with the full cost of his use of Protarga's personnel. As discussed above, Webb had certain executive officer perquisites and his work on the Five Palms project was known to other Protarga officers and directors. Further-

---

10. Protarga also asserts a set-off claim against Webb in the amount of $299,446.88 for almost ten months of his salary. Protarga contends it is owed this amount because it alleges that, "from at least October 2002 through August 2003, Webb materially neglected his duties and responsibilities ... and failed to devote his full time to the business of the Debtor...." (AP Doc. # 113, p. 13.) This set-off claim is not supported by the record.

more, Protarga presents no rational basis for allocating the abuse portion of the work of those employees. However, given Webb's concession, I can at least value those resources at $20,000 and allow that amount as a Protarga set-off against Webb's claim.

With regard to the promissory note set-off, a detailed discussion is required. During the course of his employment by Protarga dating from 1993, Webb made numerous purchases of the Protarga's stock through the exercise of options. These purchases resulted in the ownership by Webb of in excess of 200,000 shares of the Protarga's stock. A large block of one of those purchases was effected by Webb borrowing the purchase price from the Protarga. Protarga's asserted set-off arising from this transaction involves a rather complex series of events as discussed below.

On July 9, 2001 Webb executed a promissory note (the "Note") in favor of Protarga in the amount of $1,402,650.00. (Protarga Ex. # 121.) This Note was executed in order for Webb to exercise stock options to purchase 56,106 shares of stock at a price of $25.00 per share. (56,106 × $25 = $1,402,650.) Pursuant to section 4.4 of the Employment Agreement, Webb was allowed to repay this Note by tendering certain shares of the Protarga's stock. In relevant part, section 4.4 provides:

*Special Provisions Regarding Repayment of Note.* Under such reasonable procedures as may be established by the Company, the Employee may make payment for amounts due under the Note by tendering vested shares of Company stock owned by the Employee; provided, however, that the Company shall not be obligated to accept such payment to the extent that the Company, in its reasonable discretion, determines that such method of payment would be contrary to applicable law, result in unacceptable and material compliance costs under applicable law or would result in material adverse tax or financial accounting results to the Company.... [S]hares tendered as payment pursuant to this Section 4.4 shall be deemed to have a value equal to the exercise price for the associated Option.

(Protarga Ex. # 16, § 4.4.)

On July 1, 2003 Webb repaid a portion of the Note. (Protarga Ex. # 123.) Specifically, he repaid $605,875 of principal and $57,800 of interest by tendering 26,547 shares of stock valued at $25 per share. ($605,875 + $57,800 ÷ $25 = 26,547.) This tender was made by the delivery to Protarga of stock certificate # C0104 for the 56,106 shares. These shares had been purchased with proceeds of the Note for a purchase price of $25.00 per share. Protarga accepted this tender without dispute. After deducting the 26,547 shares to reflect the paydown, Protarga issued Webb a new stock certificate, bearing certificate # C0123, for the balance of 29,559 shares.

On September 3, 2003 (after Webb's employment termination and prior to filing his first proof of claim), Webb tendered additional shares in an attempt to pay off the balance of $796,775.00 of principal and $81,843.42 of interest on the Note. (Protarga Ex. # 125.) For this payoff totaling $878,642.42 [11] Webb tendered three items of consideration: (1) stock certificate # C0123 for 29,559 shares, (2) 5,581 additional shares by tendering stock certificate # C0097 for 10,001 shares, and (3) a personal check for $18.42. (29,559 shares +

---

**11.** While Webb's September 3, 2003 letter recites the aggregate of principal and interest due was $878,642.42, my calculation of the two numbers is slightly different: $796,775 + $81,843.42 = $878,618.42.

5,581 shares × $25 = 878,500 + $18.42 = $878,518.42.[12]) This tender was rejected by Protarga and Protarga's counsel advised Webb's counsel: "That [attempted tender] issue, as well as other issues arising out of his relationship with the Company, are subject to and will be addressed in the pending bankruptcy proceeding." (Protarga Ex. # 126.)

In his September 3, 2003 tender letter, for purposes of completing the pay-off of the Note, Webb valued all of the tendered shares at $25.00 per share. The 29,559 shares reflected in stock certificate # C0123 were purchased with the proceeds of the Note at an exercise price of $25.00 per share and therefore could appropriately be credited to the pay down of the Note in the amount of $738,975. (29,559 × $25 = $738,975.) However, the 10,001 shares reflected in stock certificate # C0097 were purchased by Webb at varying prices. Specifically, stock certificate # C0097 reflects Webb's purchases of the shares in the amounts and purchase prices as follows:

| # of Shares | Purchase Price |
|---|---|
| 1,107 | $30,443 |
| 2,334 | $10,270 |
| 1,862 | $ 8,193 |
| 407 | $ 895 |
| 3,160 | $20,856 |
| 1,131 | $ 2,488 |
| **Total** 10,001 | $73,145 |

(Protarga Ex. # 128.) This table reflects an average price per share of $7.31.

Webb argues that pursuant to section 4.4 of the Employment Agreement, the shares reflected in stock certificate # C0097 can be tendered in payment of the Note at a value of $25.00 per share. (Tr. 5, pp. 39, ln. 14—41, ln. 25.) Webb argues that section 4.4 of the Employment Agreement, in allowing the tender of vested shares in payment of the Note, deems the tendered shares to have a "value equal to the exercise price of the associated Option." Webb interprets this as referring to the value of the "Options" granted pursuant to the Employment Agreement and as to which Webb purchased the 56,106 shares for $25.00 per share. I disagree with Webb's interpretation for two reasons:

(1) The word "Option" in section 4.4 is not the same as the defined term "Options" in section 4.1 of the Employment Agreement. Section 4.4, in referring to the "exercise price of the associated Option," is obviously referring to the exercise price of shares purchased pursuant to a particular option, in this case being the exercise price of each "associated Option" reflected in the table above—an average price of significantly less then $25.00 per share.

(2) Webb's interpretation makes no sense. Why would an employer/corporation loan money to an employee to purchase the corporations's shares at $25 per share and allow the employee to repay the loan by tendering shares, with a deemed value of $25 per share, when those shares were purchased in different transactions at various prices, all significantly less than $25 per share? In other words, why would the employer that makes a loan to the borrower to purchase shares at $25 per share allow tender of shares to repay the loan with either (1) shares that were purchased for $25 per share *or* (2) shares that were purchased for less than $25 per share? Aside from Webb's interpretation being unreasonable, I suspect that his interpretation would raise troublesome IRS questions (as suggested by the above quot-

**12.** Similar to the above issue, this figure is $124 less than Webb's calculation of

$878,642.42.

ed portion of section 4.4 of the Employment Agreement) for Webb and Protarga.

At $25.00 per share the 5,581 shares has an aggregate value of $139,525. The 10,001 shares reflected in stock certificate # C0097 has an aggregate purchase price/value of only $73,145 (as shown in the above table). Thus, even a tender of the total number of shares reflected in stock certificate # C0097 does not amount to a payment of an obligation of $139,525. Therefore, I conclude that the Note has not been paid in full. If Protarga accepts the tender of stock certificate # C0097 for 10,001 shares, there remains a balance due of $66,380 (plus interest). ($139,525—$73,145 = $66,380.)

These two claims of Protarga constitute amounts that Protarga is entitled to as set-offs against Webb's claim and constitute a further basis why Webb's entitlement under the WPCL is not yet due and payable.

### 4. *Webb's Obligation to Sign a Release*

■ A fourth basis precluding application of the WPCL is Webb's failure to comply with a release requirement under the Employment Agreement. As a condition to Protarga's obligation to pay Webb's severance package, the Employment Agreement requires Webb to execute a release in favor of Protarga and related parties. That event has not yet occurred.

Section 5.2 states that termination without cause is "[t]ermination at the election of a Company, other than pursuant to Section 5.1 or 5.3 of this Agreement ('Termination Without Cause')." (Protarga Ex. # 16, § 5.2.) Section 5.1 relates to termination for cause and section 5.3 relates to termination caused by death or disability. Section 7.2 (captioned "Modifications to Termination Provisions") spells out the severance package payable for termination without cause and related in time to a change of control event. It spells out a severance package of greater value to the employee than that set out in section 6.2 (Termination Without Cause). It states that that package is payable in the event the employee's employment is terminated "for reasons other than (x) the Employee's resignation under Section 5.4; or (y) Termination for Cause." (*Id.*, § 7.2.) Section 5.4 relates to the employee's election to terminate and of course Webb asserts that he was not terminated for cause. However, he was not terminated by reason of a change of control. The change of control event simply had to timely precede or follow a termination. Note that section 7.2 does not provide that the termination must be caused by the change of control event or that there be any connection whatsoever other than the sequence of events.

This gets us back to section 6.2 which provides: "In the event of Termination Without Cause pursuant to Section 5.2, and the Employee executes and does not rescind a release of claims against the Company and related parties resulting from such termination ... in a form reasonably acceptable to the Company and the Employee" the severance payment is due and payable. (Protarga Ex. # 16, § 6.2.) (Release provisions such as this are fairly common in both executive employment contracts and company policy statements regarding employment terminations with severance benefits.) The only difference between what section 6.2 does and what section 7.2 does is the amount of the severance package and the period of time over which it is payable.

My conclusion is that whether terminated without cause related to a change of control or unrelated to a change of control, the severance payment is conditioned upon Webb executing and not rescinding a release of claims against Protarga and "related parties". Presumably officers and directors are such related parties. Protar-

ga's and the related parties' benefit to receiving such a release would be equally applicable to both terminations scenarios. Surely, therefore Protarga and the related parties did not intend to sacrifice that benefit where the termination without cause occurred within a specified time of the change of control event. Indeed, considering that the severance package spelled out in section 7.2 costs Protarga substantially more money, the reason for the release is even more compelling in this instance.

### 5. WPCL "liquidated damage" claim is subject to § 502(b)(7) cap

Finally, even if Webb's entitlement to "liquidated damages" has been triggered (which it has not), that obligation under the WPCL is trumped by the § 502(b)(7) cap. As amply demonstrated by the above discussion of § 502(b)(7), those damages are not "compensation" for the ensuing one year period and are therefore disallowed by reason of § 502(b)(7).

Because Webb cannot succeed under the WPCL for the reasons discussed above, he is likewise not entitled to recover attorneys fees pursuant to section 260.9a(f) of the WPCL.

*Webb's Asserted Right of Set-off*

In his post-trial brief, Webb argues that if this Court determines that he owes money to Protarga on its counterclaims, the amount owed to Webb on his $2.9 million proof of claim should be set-off before, rather than after, the imposition of the § 502(b)(7) cap, citing *In re Malden Mills Industries, Inc.*, 302 B.R. 408 (Bankr.D.Mass.2003).

However, Protarga, correctly in my view, points out that because Webb never asserted a right of set-off prior to the confirmation of the Plan, he is not entitled to a set-off. Specifically, Protarga

points out that it is settled law in the Third Circuit that "the right of a creditor to set-off in a bankruptcy reorganization proceeding must be duly exercised in the bankruptcy court before the plan of reorganization is confirmed; the failure to do so extinguishes the claim." *In re Cont'l Airlines*, 134 F.3d 536, 542 (3d Cir.1998); *United States v. Norton*, 717 F.2d 767 (3d Cir.1983) (holding set-off is not permitted after confirmation of plan of reorganization). Webb's failure to assert a right of set-off prior to confirmation of the Plan is therefore fatal to his assertion.

Furthermore, the confirmed Plan precludes such a set-off. Section 10.4(d) of the Plan enjoins any entity (including a person) having a claim against the reorganized debtor from "asserting any right of setoff ...." (Doc. # 465, § 10.4.) Webb is bound by the terms of the Plan and is therefore precluded from asserting any right of set-off against the reorganized debtor. The above Third Circuit law and any plan terms were apparently not relevant in the *Malden Mills* case because "the parties agree[d] that [the creditor] holds a right of set-off against [the debtor] ...." 302 B.R. at 412.

*Webb's Asserted Right of Indemnification*

In his answer (AP Doc. # 5) to the complaint, Webb asserts one counterclaim against Protarga for indemnification for expenses, including attorneys' fees, incurred in connection with this litigation. In his post-trial pleadings, Webb does not address the indemnification issue. Indeed, in his second amended proof of claim Webb states that his indemnification claim "will be the subject of a separate motion to be filed in Bankruptcy Court." (Claim # 245, p. 12.) Thus, I need not address the indemnification issue here other than to express my puzzlement that there could be any possible basis in this dispute for Webb to succeed in such a motion.

*Injunction of Webb's State Court Action*

On July 11, 2005, at the beginning of the last day of the trial of this matter I stated that, after a review of Protarga's confirmed Plan, it seemed to me that Webb's state court action under the WPCL against Dickey and Koerner and their indemnification rights implicated a consummation of the Plan in several ways. I noted that Plan section 10.4 sets forth an injunction provision against the pursuit of claims outside the bankruptcy scheme. Specifically, in relevant part, that section provides:

> *Injunction.* Except as otherwise expressly provided in the Plan, the Confirmation Order or a separate order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against the Debtor, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, ... and (e) commencing or continuing in any manner any action or other proceeding of any kind with respect to any claims and Causes of Action which are extinguished, dismissed or released pursuant to the Plan.

(Doc. # 465, § 10.4.) I noted that this provision is not limited to pursuit by claimants against Protarga alone and, of course, section 17.1 of the Plan makes clear that this Court retains jurisdiction to enforce the injunction. I then stated that if the existing complaint did not already seek an injunction of the state court WPCL action, I would allow Protarga to amend its complaint to seek such relief.

After a brief recess during which the parties conferred, Protarga's counsel handed up a proposed form of order. I signed the order in the mistaken belief that it was simply an order authorizing Protarga to file an amended complaint to include the injunction count. In fact, the order that I signed (AP Doc. # 105) granted a permanent injunction with respect to the entire state court action, including the defamation count. This obviously was a mistake and on July 12, 2005, by way of a conference call, I advised counsel of the mistake and the need to have it corrected. Protarga's counsel responded to this by sending over a different form of order that I also found to be incorrect. To resolve the situation I entered an order (AP Doc. # 109) vacating the July 11, 2005 order (AP Doc. # 105). I then entered an order that recites, pursuant to my July 11, 2005 suggestion, "that Plaintiff is granted leave to amend its complaint to seek additional relief in the form of an injunction to bar Defendant Nigel L. Webb from pursuing any cause of action against any of the Plaintiff's officers or directors which seeks any recovery on claims which are the subject of this adversary proceeding, based upon the Pennsylvania Wage Payment and Collection Law or otherwise." (AP Doc. # 110.) Protarga has not filed an amended complaint pursuant to that authorization. If Protarga wishes this Court to rule on the injunction issue, it will have to file an amended complaint pursuant to the authorization. If such an amendment is filed, I believe it is highly likely that an injunction will be granted.[13] Under the circumstances, I believe it appropriate to address the injunction issue in some detail so that counsel will have the benefit of my thinking on this issue.

I believe there are a number of reasons why Webb's WPCL state court complaint against Dickey and Koerner should not be allowed to continue.

---

**13.** Of course, the granting of any such relief will have no bearing on Webb's right to pursue his defamation count in the state court action.

First, under Third Circuit law Webb's wage claim is a pre-petition claim that is not due and payable from Dickey and Koerner. *Belcufine v. Aloe*, 112 F.3d 633 (3d Cir.1997). The clear holding in *Belcufine* is that WPCL claims against officers are contingent on the existence of a wage law claim against the corporate employer on whose behalf those officers act, and when the corporate employer is in bankruptcy, by operation of the Bankruptcy Code, it is precluded from paying pre-petition wage claims, and the officers are likewise excused from making such payments. That is the situation here.

*Belcufine* involved a bankruptcy case in which certain employees earned pre-petition benefits which were scheduled to be paid in the future. However, before the payment date arrived the debtor/employer filed its bankruptcy petition. Absent an appropriate order from the bankruptcy court, the Bankruptcy Code precludes the payment of pre-petition debts, such as the benefits, during the pendency of the case and subjects those payments to the terms of a confirmed plan. As in the case at bar, the employees of the debtor did not seek a termination of the Bankruptcy Code's automatic stay, nor did they otherwise seek an order allowing payment from the debtor. Instead, the employees filed a complaint against certain officers of the debtor seeking, pursuant to the WPCL, the payment of their benefits by the officers. The Bankruptcy Court, the District Court and the Court of Appeals denied the relief sought by the employees. The Court of Appeals opinion is very instructive on the matter at hand and I therefore quote extensively from it.

The dispute here is over whether the employees' claim is for benefits that were "due and payable" under the WPCL. The district court held that they were not since federal bankruptcy law operated to prevent these benefits (which came due after Shenango filed for bankruptcy) from being "due and payable." We agree.

The liability of corporate managers under the WPCL is a "contingent" liability, i.e., it is contingent on the corporation's failure to pay debts that it owes. Once a corporation files a Chapter 11 petition, however, it is obligated to pay wages and benefits only to extent required by the bankruptcy workout. Hence, when a corporation under Chapter 11 fails to make payments that the Bankruptcy Code does not permit, the contingency needed to trigger the liability of corporate managers under the Pennsylvania WPCL never occurs. Here, Shenango was current on all of its payments in the pre-petition period. The employees' claims are for amounts that technically came due in the postpetition period. Since the corporation was not permitted by law to pay these claims in the post-petition period, the contingency of the amounts becoming "due and payable" under the WPCL did not occur, and hence the managers were not personally liable.[14]

112 F.3d at 639 (internal citations omitted).

The facts here are strikingly similar to those in *Belcufine*. Webb's employment was terminated on July 24, 2003. Protarga's bankruptcy petition was filed on August 14, 2003. Webb did not assert his $2.9 million claim until he filed his proof of claim in the bankruptcy case on October 28, 2003.[15] During the pendency of the

**14.** Even the dissent in *Belcufine* acknowledged that "as a practical matter, I have no quarrel with the characterization of [the offi-

cers'] liability as contingent...." 112 F.3d at 642.

**15.** Webb's initial proof of claim asserted a claim of $2.6 million. That proof of claim is

bankruptcy case Webb sought no relief from the § 362 automatic stay, nor did he otherwise seek to except his claim from the bankruptcy workout. That workout resulted in the Plan being confirmed on January 14, 2005.

Under the terms of the Plan (which, pursuant to § 1141(a) [16], is binding on all creditors, including Webb), Webb's wage claim does not become an allowed claim until the claim is the subject of a final order. Since a final order has not yet been entered, Webb does not presently have a wage claim that is due and payable. Once that allowed claim is paid by Protarga in the form of a combination of cash and an interest in the Unsecured Creditors Note, in light of the *Belcufine* holding, I do not understand how Webb could have an independent wage claim against Dickey and Koerner. Indeed, Webb's alleged $2.9 million wage claim has been discharged pursuant to § 1141(d) [17] and when he obtains an allowed claim in this Court he will have a different claim in a different amount that will be satisfied by a combination of cash and contingent payments at a later date.

Notwithstanding my view of the preclusive effect of *Belcufine*, for jurisdictional purposes, it may be that the state court should address this issue upon an appropriate application to that court.

However, there are two additional reasons why, as a matter of bankruptcy jurisprudence, I believe it would be appropriate for this Court, in a proper procedural posture, to enjoin Webb's state court WPCL claim.

 Pursuant to the terms of the Plan and the confirmation order, this Court continues to have jurisdiction over the Chapter 11 case. The confirmation order provides:

> This Court hereby retains jurisdiction of this case pursuant to, and for the purposes of, the Plan and such other purposes as may be necessary and useful to aid the confirmation, consummation and implementation of the Plan to the extent that the Court may legally retain jurisdiction of such matters.

(Doc. # 525, p. 7.) Pursuant to section 12.1 of the Plan, this jurisdiction covers the following matters:

> (e) To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Section 1142 of the Bankruptcy Code; . . .

> (h) To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan; . . .

---

attached as an exhibit to Webb's state court complaint. Webb's second amended proof of claim is in the amount of $2.9 million. Presumably, Webb's state court wage complaint will be amended to increase the damage claim to $2.9 million.

**16.** Section 1141(a) provides:
> Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the

claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

**17.** In relevant part, § 1141(d) reads:
> (1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
> (A) discharges the debtor from any debt that arose before the date of such confirmation . . . .

(k) To hear any other matter not inconsistent with the Bankruptcy Code; ... and

(m) To enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan.

(Doc. # 465, § 12.1.) Moreover, this Court has the right and power to enforce the Plan's discharge and discharge injunction separate and apart from the Plan and Confirmation Order. *See Thomas v. General Motors Corp.,* 522 U.S. 222, 236, 118 S.Ct. 657, 665, 139 L.Ed.2d 580 (1998); *In re Beck,* 283 B.R. 163, 166–67 (Bankr.E.D.Pa. 2002). "It is axiomatic that a court possesses the inherent authority to enforce its own orders." *In re Cont'l Airlines, Inc.,* 236 B.R. 318, 325–26 (Bankr.D.Del.1999) (citations omitted), *aff'd,* 279 F.3d 226 (3d Cir.2002); *see also* Fed. R. Bankr.P. 3020(d) ("Notwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate."). Section 105(a) also provides that a bankruptcy court is authorized to issue any order, process or judgment necessary to carry out the provisions of the Bankruptcy Code, and "gives the bankruptcy court 'the power and the jurisdiction to enforce its valid orders.'" *In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 266 (3d Cir.1991) (quoting *In re Radco Merch. Servs., Inc.,* 111 B.R. 684, 688–89 (N.D.Ill.1990)); 11 U.S.C. § 105(a). In the exercise of this authority, courts have inherent powers to enforce compliance with and execution of their lawful orders. *See Cont'l Airlines,* 236 B.R. at 331 (finding creditors in contempt of plan and confirmation order and awarding debtor attorneys' fees and costs); *In re Kennedy,* 80 B.R. 673 (Bankr.D.Del.1987) (finding party in contempt of court order and awarding attorneys' fees incurred in bringing motion for contempt).

While Webb's severance package may be calculated as $2.9 million, as discussed above in detail, that package of "damages" is subject to the § 502(b)(7) cap on claims arising out of an employment agreement breach. At this time Webb potentially has an allowed claim of $416,417.39, subject to set-offs. When finally allowed, Webb's wage claim will thus be a small fraction of his alleged claim of $2.9 million.

According to the Plan, Webb has a general unsecured claim in Class 4A. According to the Disclosure Statement the Class 4A claimants are entitled to three different treatments, depending on the creditor's election. As noted above, Webb, together with numerous other creditors in Class 4A, will receive a combination of "up-front cash" (approximately 31% of the claim) and an interest in the Unsecured Creditors Note (approximately 69% of the claim). According to the Disclosure Statement the cash payment will be between 31% and 38%, depending on the final allowed amount of Webb's claim. For purposes of the Disclosure Statement, Protarga assumed Webb's disputed claim to be $2.6 million, so that if allowed in that amount the cash payment to Class 4A claimants would be 31%. If Webb's claim is allowed in the amount of the $416,417.39 then the cash distribution to Class 4A creditors will approach the higher 38% distribution level. At such time as Webb obtains an allowed claim in this Court, as a Class 4A claimant he will receive his distribution entitlement of cash and the interest in the promissory note.

Thereafter, if Webb succeeds in the state court action, obtains a judgment of $2.9 million and collects on that judgment, then he will have effectively obtained a recovery on his claim that (a) far exceeds

any claim that may be allowed in this Court, (b) is paid in cash, unlike his claim treatment under the Plan and (c) is not "contingent" as to Dickey and Koerner because Protarga will have paid it and it will never be due and payable as to those two officers.

There is a further, and more serious, impact of Webb's state court WPCL claim on the bankruptcy jurisprudence.

If Webb succeeds in his state court WPCL claim and recovers from Dickey and Koerner a money judgment in the amount of $2.9 million and that judgment is paid, then Dickey and Koerner will have what clearly appear to be legitimate indemnification claims against Protarga. If those indemnification claims are allowed and paid, they will significantly reduce the payments to other creditors of Protarga's estate. The result will be the equivalent of Protarga paying Webb $2.9 million. The net effect will be that (a) Webb will have received from Protarga's estate payment in full on his asserted but disallowed $2.9 million claim at the expense of other creditors of the estate[18] and (b) he will receive full payment in cash whereas other similarly situated creditors in Class 4A will receive most of their recovery in the form of an interest in a promissory note of problematic value. In my view, such a result produces a clear conflict between state law and the Bankruptcy Code. The relevant case law clearly supports the conclusion that in this matter the Bankruptcy Code trumps the state law.

 "Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two

statutes and then determining the constitutional question whether they are in conflict." *Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971). In doing this analysis, the court must examine the effect and not just the stated purpose of each statute. *Id.* at 652, 91 S.Ct. at 1712. In its discussion in *Perez*, the Supreme Court articulated "the controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." *Id.* When a court is analyzing conflict preemption, which is at stake here, "the task—as in all preemption analysis—is to determine whether state regulation is consistent with the structure and purpose of the federal statute as a whole." *40235 Wash. St. Corp. v. Lusardi*, 177 F.Supp.2d 1090, 1103 (S.D.Cal.2001) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). "A sufficient conflict occurs when the state law has a direct and substantial impact on the federal scheme." *Id.* (citing *Gade*, 505 U.S. at 107, 112 S.Ct. 2374).

Indeed, the Bankruptcy Court decision in the *Belcufine* case found that the Bankruptcy Code preempted the WPCL. *Belcufine v. Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623 (Bankr.W.D.Pa.1995). The court discussed the way in which the Bankruptcy Code dictates the treatment and payment of claims and that debtors are not allowed to stray from such treatment. *Id.* at 627. Where the WPCL does not become implicated until after the petition is filed, the court noted that it conflicts with the mandate of the Bankruptcy Code. Specifically the court stated that allowing a creditor to recover pursuant to the WPCL "would undermine the distribu-

---

**18.** It is axiomatic that in any bankruptcy case where § 502(b)(7) has application, that cap benefits the unsecured creditors other than the employee claimant—a result Congress obviously intended.

tion scheme set forth by the bankruptcy code as it would require the debtor-in-possession's officers to make payments that the bankruptcy code prevents the debtor from making." *Id.* at 628. The court pointed out that an additional point of conflict exists because the state court action would allow the former employees to circumvent the § 502(b)(7) cap. Similar to the instant matter, the court also noted that "[s]everal of the Plaintiffs hold allowed claims under the plan based upon the same amounts they are seeking to collect under the WPCL. The claimants are bound by the plan regardless of whether or not they voted favorably for it. Seeking payment under the WPCL is, in effect, seeking a double recovery of those amounts." *Id.* at 629. For all of these reasons, the court held that "[w]here a claimant seeks to recover postpetition payments on a prepetition debt which the debtor is not permitted to be [sic] make pursuant to the code, the WPCL is not applicable." *Id.*

By reason of the order I entered on July 12, 2005 (Doc. # 110) Protarga is authorized to amend its complaint to include injunctive relief against Webb. If Protarga files such an amended complaint, I will then conduct a brief status conference on how to proceed to a ruling on the relief requested. Additional briefing may be appropriate, but I believe the existing record in this adversary proceeding is sufficient and complete to address what I view as black letter bankruptcy law and unambiguous provisions of the Plan.

## CONCLUSION

For the reasons set forth above, I conclude that (a) Webb's employment was terminated on July 24, 2003 without cause as that term is defined in the Employment Agreement, (b) Webb has a Class 4A general unsecured claim in the amount of $416,417.39, but subject to (i) a Protarga set-off of $20,000 (reimbursement for Webb's personal use of Protarga resources) (ii) a Protarga set-off for the Note balance of what appears to be $66,380 (plus interest), and (iii) the execution by Webb of a release. The parties should confer to seek agreement on a form of order to reflect this ruling. Absent such an agreement, we will have a further hearing to resolve any remaining issues. I find no basis for any judgment against Five Palms. If Protarga wishes to file an amended complaint with respect to the injunction issue we will have a conference to decide how to proceed on that issue. Any dispute remaining regarding Webb's Proof of Interest will be addressed at a later date.