19-1725
In Re: 21st Century Oncology Holdings, Inc.

United States Court of Appeals
for the Second Circuit

AUGUST TERM 2019
No. 19-1725

In Re: 21st Century Oncology Holdings, Inc., AKA Radiation Therapy Services Holdings, Inc.,
Reorganized Debtor.

**********************************

ANDREW L. WOODS,
Appellant,

v.

21ST CENTURY ONCOLOGY HOLDINGS, INC.,
AKA RADIATION THERAPY SERVICES HOLDINGS, INC.,
Reorganized Debtor-Appellee.[*]

ARGUED: MARCH 25, 2020
DECIDED: JULY 20, 2020

Before:     JACOBS, POOLER, and CARNEY, Circuit Judges.

---

[*] The Clerk of the Court is respectfully directed to amend the official caption to conform to the above.

1

Andrew L. Woods appeals from a bankruptcy court order capping his claim for certain incentive payments promised by his former employer pursuant to 11 U.S.C. § 502(b)(7), which limits employee claims for damages "resulting from the termination of an employment contract." Because Woods' right to receive the payments was accelerated as a result of his termination, we hold that § 502(b)(7) applied to his claim, and therefore affirm the judgment of the bankruptcy court.

Affirmed.

_____

LEON N. PATRICIOS, Zumpano Patricios, P.A., Coral Gables, FL, (John E. Jureller, Jr., Klestadt Winters Jureller Southard & Stevens, LLP, on the brief) for Appellant Andrew L. Woods.

JEFFREY R. GLEIT, Sullivan & Worcester LLP, New York, NY, for Appellee 21st Century Oncology Holdings, Inc., AKA Radiation Therapy Services Holdings, Inc.

DENNIS JACOBS, Circuit Judge:

2

Andrew L. Wood, a lobbyist with appellee 21st Century Oncology Associates, Inc. ("21C") until his termination, appeals from the Decision and Order of the District Court for the Southern District of New York (McMahon, CJ.) affirming the judgment of the Bankruptcy Court for the Southern District of New York (Drain, J.), which reduced Woods' allowed claim for certain deferred incentive bonus payments pursuant to section 502(b)(7) of chapter 11 of the U.S. Code (the "Bankruptcy Code"). That subsection limits claims for damages "resulting from termination of an employment contract" to the sum of: (1) a single year of compensation "without acceleration"; and (2) unpaid compensation "due . . . without acceleration" on the date of termination. 11 U.S.C. § 502(b)(7)(A)-(B).

At the time of termination, certain lobbying objectives specified in Woods' employment contract had been achieved, triggering provisions that promised him $10 million in incentive bonuses. Under the contract, the bonus payments were payable over a period of five years, but became due in full when and because Woods was fired without cause. On appeal, Woods contends that § 502(b)(7) applies only to forward-looking claims in the nature of severance--not

3

to claims for compensation on account of services already performed--and draws the analogy to pensions, which courts have declined to cap. Woods argues that because his rights to receive the incentive bonuses were fully vested prior to his termination, the timing of the bonus payments was irrelevant to the application of § 502(b)(7). We affirm because, pursuant to Woods' contract, portions of the incentive bonuses were not in fact due prior to termination, but were accelerated as the contract expressly provides. Accordingly, the plain language of § 502(b)(7) requires that we apply its cap to Woods' claim for accelerated payments.

**BACKGROUND**

**I**

21C, a provider of radiation therapy to cancer patients, employed Woods from approximately 2010 to September 23, 2016. The Amended and Restated Executive Employment Agreement dated May 13, 2013 (the "Employment Agreement") assigned Woods to promote legislative and administrative initiatives that would enhance 21C's profitability by increasing Medicare

4

reimbursements to freestanding radiation therapy clinics.   In addition to various other forms of compensation, including a $1 million annual salary and health benefits, Woods was promised incentive bonus payments totaling $10 million (the "Incentive Bonuses") if the desired reforms were adopted--which they were.

Specifically, Section 3(b) of the Employment Agreement, titled "Executive Compensation," provides as follows:

> Performance Incentive and Other Bonuses. The Executive shall be entitled to receive the following incentive bonuses:
>
> (i) Five Million Dollars ($5,000,000) from the Company for achievement during the Term of a freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers except for those reductions negotiated on behalf of the Company,
>
> (ii) Two Million Five Hundred Thousand Dollars ($2,500,000) from the Company for achievement during the Term of adoption of a new, multi-bundled payment system for freestanding radiation therapy centers, to which the Company elects not to participate,
>
> (iii) Two Million Five Hundred Thousand Dollars ($2,500,000) upon the Company's initial election to participate in any way in the system referred to in clause (ii) above, and
>
> (iv) other cash bonuses as agreed to in writing in the future . . . .

Employment Agreement § 3(b).

The Incentive Bonuses were payable in annual installments. Woods would receive the payments over a five-year period of continued employment except under certain circumstances--including Woods' termination without cause--in which case he would receive an "accelerated" lump sum:

> Payments under clauses (i) through (iii) above shall be made *annually over a five year period*, with the first payment payable within five (5) business days following the freeze, adoption or election, respectively. *Any deferred payments of incentive bonuses shall be immediately accelerated and paid in full in the event of (A) the Executive's termination without Cause*, termination by the Executive for Good Reason or as a result of the Executive's death or Disability or (B) upon a "Change of Control" . . . , a "Sale of the Company" . . . , or a "Public Offering" . . . .

Id. (emphasis added). Under the contract, if Woods were terminated without cause he would receive, in addition to an accelerated Incentive Bonus payment, 24 monthly "Severance Payments" totaling one year's base salary of $1 million as well as continued health insurance. Employment Agreement § 5(b). Conversely, Woods would forfeit any unpaid Incentive Bonuses (as well as the Severance Payments and health insurance coverage) if he resigned without good reason or were terminated for cause. See Employment Agreement § 5(d)-(e) (providing that under these circumstances Woods "shall only be entitled to the

6

Accrued Compensation"); id. §§ 5(b), 6 (distinguishing Accrued Compensation from "deferred payments of performance incentive bonuses pursuant to Section 3(b)").

During Woods' tenure at 21C, the federal government made the changes to Medicare reimbursement rates and procedures that 21C had sought: on December 28, 2015, Congress froze reductions in Medicare reimbursement for freestanding radiation therapy centers like 21C's; and on June 29, 2016, the Centers for Medicare and Medicaid Services introduced a multi-bundled payment system for cancer care services, in which 21C elected to participate. As a result, Woods received an initial Incentive Bonus payment of $1 million, leaving $9 million in bonuses yet to be paid.

On September 23, 2016, 21C terminated Woods without cause.[1] When 21C refused Woods' request for immediate payment of $9 million in additional Incentive Bonuses, Woods filed suit. On May 25, 2017, 21C and its affiliates

---

[1] 21C initially took the position that Woods was terminated for cause, but now concedes that the firing was without cause. See Appellee's Br. at 6.

filed chapter 11 cases for bankruptcy protection in the Bankruptcy Court for the

Southern District of New York (the "Chapter 11 Cases").

## II

Woods filed a claim in the Chapter 11 Cases seeking, among other things,

$9 million in unpaid Incentive Bonuses and $1 million in Severance Payments.

In response, 21C and its affiliated debtors (collectively, the "Debtors") filed a

limited objection. In relevant part, the Debtors argued that the portion of

Woods' claim attributable to deferred Incentive Bonuses should be reduced

pursuant to 11 U.S.C. § 502(b)(7), which caps at one year's compensation "the

claim of an employee for damages resulting from the termination of an

employment contract."

The bankruptcy court ruled that the Incentive Bonuses were subject to the

cap under § 502(b)(7). In re 21st Century Oncology Holdings, Inc., 597 B.R. 217,

234 (Bankr. S.D.N.Y. 2019), aff'd, No. 19 CIV. 1102 (CM), 2019 WL 2498264

(S.D.N.Y. June 3, 2019). The court reasoned that the Incentive Bonuses did not

"vest" when the Medicare reforms specified in § 3(b) of the Employment

Agreement were made; on the contrary (the court went on), the full amount of

8

the Incentive Bonuses became payable only as a result of Woods' termination. Id. at 228-29.   The court concluded that the plain language of § 502(b)(7) capped the deferred Incentive Bonuses because they were not in fact due "without acceleration" prior to Woods' termination.   Id. at 228 (quoting 11 U.S.C. § 502(b)(7)(B)).

On February 1, 2019, the bankruptcy court entered a final order capping Woods' Incentive Bonus claim at $4 million.   Pursuant to § 502(b)(7)(A)-(B), that figure included unpaid Incentive Bonuses that were due and payable as of Woods' termination, as well as the bonuses that would have come due in the one-year period following his termination had he remained employed.[2]   The bankruptcy court's order was affirmed by the District Court for the Southern

---

[2] In the bankruptcy court, the Debtors argued that Woods' claim should be reduced to reflect that the two $2.5 million bonuses described in §§ 3(b)(ii) and 3(b)(iii) of the Employment Agreement were mutually exclusive.   In re 21st Century Oncology Holdings, Inc., 597 B.R. at 233-34.   The bankruptcy court ruled that the Employment Agreement was ambiguous on this point, and ordered discovery to elicit parol evidence.   Id. at 234.   However, to avoid the cost of further litigation, the Debtors withdrew their objection to Woods' claim for Incentive Bonuses under § 3(b)(iii) of the Employment Agreement.   See Appellee's Br. at 8.

District of New York (McMahon, CJ.), and on June 10, 2019, Woods entered a timely notice of appeal.

## DISCUSSION

## I

We review de novo the bankruptcy court's legal conclusions concerning the interpretation of § 502(b)(7) and its application to Woods' Employment Agreement.   See In re N. New England Tel. Operations LLC, 795 F.3d 343, 346 (2d Cir. 2015) (explaining that this Court "independently review[s]" the legal conclusions of a bankruptcy court de novo notwithstanding the intermediate review of the district court).   21C has accepted Woods' factual allegations as true for purposes of this appeal.

Section 502(b)(7) of the Bankruptcy Code provides that if a party objects to the claim of an employee of the debtor, the bankruptcy court shall allow the claim except:

> if such claim is . . . for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, *without acceleration*, for one year following the earlier of—

    (i) the date of the filing of the petition; or

    (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, *without acceleration*, on the earlier of such dates.

11 U.S.C. § 502(b)(7) (emphasis added). In practice, this provision acts a cap on a terminated employee's otherwise-valid state law claim for contract damages arising from termination, limiting the "allowed" amount of such claim to the sum of: (1) one year's future compensation under the employment contract; and (2) any back pay due, without acceleration, on the date of the employee's termination. See In re Condor Sys., Inc., 296 B.R. 5, 12 (B.A.P. 9th Cir. 2003) (explaining that § 502(b)(7) "merely establishes a limit on what will be allowed to be paid from the bankruptcy estate and is . . . [not] a limit on substantive damages").

## II

On appeal, Woods argues as follows: § 502(b)(7) is inapplicable to the deferred Incentive Bonuses because Woods' right to payment did not "result[]

11

from the termination of an employment contract," as the statute requires, Appellant's Br. at 14; he earned the right to full payment of the Incentive Bonuses prior to his termination, when the events described in Section 3(b)(i)-(iii) of the Employment Agreement (the "Triggering Events") transpired, id. at 17; with the enactment of the desired Medicare reforms, 21C received all that it had bargained for, and no further performance was required on his part, id. at 30; therefore, whether Woods received the payment in installments or in a lump sum was "irrelevant" to the application of § 502(b)(7), id. at 26. In sum, Woods argues that the deferred Incentive Bonuses were "fundamentally different from severance pay," since they were "fully vested" prior to his termination--like fully vested employee retirement benefits, which fall outside the scope of § 502(b)(7). Id. at 24-25.

Whatever its intuitive appeal, Woods' position is incompatible with the plain language of the Bankruptcy Code. Section 502(b)(7) typically applies to the severance claims of senior executives[3]; and, as Woods points out, the

---

[3] See In re VeraSun Energy Corp., 467 B.R. 757, 765 (Bankr. D. Del. 2012) (noting that "[c]ourts considering the policy behind § 502(b)(7) have said that the section 'was designed to limit the claims of key executives who had been able to

12

Incentive Bonuses differ from severance because they are compensation for services already performed. However, the text of § 502(b)(7) is not necessarily limited to snipping the cords on golden parachutes. See, e.g., In re Dornier Aviation (N. Am.), Inc., 305 B.R. 650, 651 (E.D. Va. 2004) (applying § 502(b)(7) cap to employee claims for damages arising from employer's failure to provide them with ninety days' notice prior to termination as required by their employment agreements); VeraSun, 467 B.R. at 762, 767 (capping employee claims under contract provisions described as "stay in place" agreements). In short, a claim may be subject to the § 502(b)(7) cap whether or not it is characterized as severance.

Section 502(b)(7) applies broadly to employee claims for "damages resulting from the termination of an employment contract," except to the extent that the claim is for "unpaid compensation due . . . without acceleration," on the date of termination. 11 U.S.C. § 502(b)(7). The Employment Agreement makes explicit that the deferred incentive bonuses were not "due . . . without

_____

negotiate contracts with very beneficial terms'") (quoting In re Protarga Inc., 329 B.R. 451, 465 (Bankr. D. Del. 2005)).

13

acceleration" on September 23, 2016, the date of Woods' termination. Absent

termination of the employment contract, Woods would not have received full

payment unless he remained employed with 21C for five years after the

Triggering Events.[4] The Triggering Events were thus necessary but not

sufficient conditions for payment of the deferred Incentive Bonuses.[5] Only

through continued employment--or the termination of the Employment

Agreement under specified circumstances--could Woods obtain the full amount

of the deferred Incentive Bonuses.

Further, the statute's explicit provisions for "acceleration" subvert Woods'

contention that the timing of the Incentive Bonus payments was "irrelevant."

Appellant's Br. at 26. Twice, § 502(b)(7) excludes from an employee's allowed

claim any compensation that come due as a result of "acceleration" upon

---

[4] See Employment Agreement § 5(d)-(e) (providing that if Woods resigns without good reason or is terminated for cause, he "shall only be entitled to the Accrued Compensation"); id. §§ 5(b), 6 (excluding from Accrued Compensation "deferred payments of performance incentive bonuses").

[5] The Employment Agreement also provided, at § 5(f), that Woods would "forfeit all rights" to payment of the deferred Incentive Bonuses if he failed to execute a "general release of claims in favor of [21C]" within 60 days of his termination.

14

termination of the employment contract.   See 11 U.S.C. § 502(b)(7)(A), (B) (limiting employee's allowed claim to "the compensation provided by [the employment] contract, *without acceleration*, for one year following the [date of termination]" plus "unpaid compensation due under such contract, *without acceleration*, on the [date of termination]" (emphasis added)).   Section 3(b) of the Employment Agreement expressly speaks in terms of acceleration, providing that "deferred payments of incentive bonuses shall be immediately accelerated and paid in full in the event of . . . [Woods'] termination without Cause." Woods' position that the acceleration of the Incentive Bonus payments upon Woods' termination was "irrelevant" would "effectively erase the phrase 'without acceleration' from the statute and impermissibly redraw the line Congress carefully drew between capped and uncapped contract termination claims."   Dornier, 305 B.R. at 655.

Finally, Woods argues that his claim for deferred Incentive Bonuses is analogous to a claim for vested retirement benefits, which various courts have concluded fall outside the scope of § 502(b)(7).   See, e.g., In re Prospect Hill Res., Inc., 837 F.2d 453, 455 (11th Cir. 1988) (reasoning that § 502(b)(7) "limits claims

15

for future compensation" whereas "[a] retired employee . . . has done his work and earned his retirement" and "the right to the bargained-for benefit has vested"). If anything, this comparison highlights the weakness of the assertion that Woods' rights to the deferred Incentive Bonuses "vested" prior to his termination. An employee's retirement benefits cannot be deemed "vested" if she would forfeit them by deciding to retire. Yet that is exactly what the Employment Agreement provided with respect to the deferred Incentive Bonuses: as discussed above, if Woods were to "voluntarily terminate[] his employment . . . not for Good Reason," he would forgo any further deferred Incentive Bonus payments. Employment Agreement §§ 5(e), (b). For the same reason, this case is distinguishable from those instances in which courts have declined to apply the § 502(b)(7) cap to other "vested" employee entitlements.[6]

As the bankruptcy court explained, we are required to apply the plain language of § 502(b)(7) absent absurd results. 21st Century Oncology, 597 B.R.

---

[6] See In re Irvine-Pac. Commercial Ins. Brokers, Inc., 228 B.R. 245 (B.A.P. 9th Cir. 1998) (employee had fully vested stake in deferred compensation and was entitled to payment upon resignation); In re Handy Andy Home Improvement Ctrs., Inc., 1997 WL 401583 (Bankr. N.D. Ill. July 9, 1997) (Illinois statute granted employee nonforfeitable right to partial payment of incentive bonus).

at 228 (citing <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 534 (2004)). Woods' services may have benefited 21C; but the imposition of a partial cap on his allowed claim for deferred Incentive Bonuses is far from absurd. Applying Congress's broad language as written may serve to prevent employers and executives from evading the § 502(b)(7) cap through artful drafting--recasting a golden parachute as an incentive payment for goals easily achieved.

* * *

Because the deferred Incentive Bonus payments in dispute were not "due . . . without acceleration" on the date of Woods' termination, we hold that they were properly subject to the § 502(b)(7) cap. Therefore, the judgment of the bankruptcy court is **AFFIRMED**.